The prisoner was convicted of the crime of rape upon the person of one Mattie E. Williams, and appealed from the sentence of death pronounced by the court. A synopsis of the evidence is necessary to explain the exceptions.
The State's evidence tended to show the following circumstances. The prosecutrix is the wife of Samuel Williams. Their only child is two years of age. They lived at Dr. Mariner's place, on the Pea Ridge road, about three miles from Belhaven, with the husband's mother, sister, and brother. Mrs. Satterthwaite, a sister of the prosecutrix, lived at Hope Store, a quarter of a mile down the road. Seventy-five yards from the junction of the Pea Ridge and Belhaven roads was the Williams mail box. Along the road between the Williams home and the mail box two-thirds of the adjoining land is cleared, and one-third in woods. There are two or three houses on the cleared land. At about eight in the morning of a Thursday in March, 1922, while her husband was working at a distance in the field, the prosecutrix went to the mail box, and from there to the home of her sister, where she remained perhaps fifteen minutes. She did not know how long it took her to walk to her sister's. On her return home, impelled by sudden indisposition, she went into the woods, and while there was criminally assaulted by the *Page 647 
prisoner. She begged, pleaded, and struggled. After accomplishing his purpose, the prisoner said that if she told what he had done, he would kill her husband and the whole family. She had known the prisoner for some time, and he had never before offered her any indignity. As she walked home, she wept, but made no outcry. On reaching home about 10 o'clock, she went first to her room for a minute or two and then to the cook-room, where she found her husband's mother and sister. She remained there until dinner time, when her husband came. He was at home Thursday, Friday, and a part of Saturday. He and she occupied a room together. She mentioned the subject first to her husband on Sunday night after they had retired. In the meanwhile, she had frequently wept in his presence and had repeatedly refused to tell him the cause. She testified: "From the moment this occurred until I told my husband, my physical condition was such that I was just feeling it all the time, and I could not rest in any way, and when he mentioned anything to me, I couldn't keep from crying; it would hurt his feelings and he would turn and go off and not say anything to me. I do not mean that he turned in anger. He would ask me if I was sick and didn't want a doctor, and I told him no. He would ask what was the matter, and I would commence crying, and he would leave me. He couldn't bear to see me cry. . . . I did not tell him before Sunday simply because I didn't see how I could. Such a thing as that I would rather die than tell it; then he threatened our lives, that was a hard part, too; it made me fearful for myself and my family's safety. . . . I did not mention it to him until Sunday night after we had gone to bed. I saw my sister a few minutes Sunday night. I lived with my sister before I was married, and we were fond of each other."
The prosecutrix was corroborated by her husband, who said, also, that the prisoner came back to his home at 10:30; and Dr. Mariner testified that about a week after the assault was said to have occurred he examined the prosecutrix and found her genital organs bruised and inflamed. There was evidence tending to show that the character of the prosecutrix and her husband is good.
For the defendant there was evidence tending to show an alibi. Noland Davis testified that the prisoner came to his house at 7 o'clock Thursday morning, saying he had come from Williams's and remained there until after the mail car passed, and that the two then went to Satterthwaite's store, and were together until 9:45, when the prisoner said he had to go to Belhaven. J. B. Satterthwaite, a witness for the defendant, testified that he is a brother-in-law of the prosecutrix, and conducted a mercantile business at Hope Store; that the prosecutrix left his house at 8 o'clock going home; that between 6 and 7 o'clock the prisoner passed his store going to Williams's, and about 10 o'clock came *Page 648 
to the store with Norval Davis and asked what time it was. He did not act as if drinking, and was not under the influence of liquor. The prisoner testified: "I went to Williams's house on Thursday morning. I stopped at Mr. Satterthwaite's store. I was riding on my wheel and I left the store and went to Mr. Williams's. He was in the kitchen. I went from the house to the stables to hitch up the mules. After the mules were hooked up, he told me to take my wheel and carry a package to Mr. Stevens. Stevens was a conjure doctor. He told me it was 25 minutes of 8, or half-past 7 at that time. He told me to meet the fellow on the road. I went as far as Norval Davis's. I stopped there and sat on the front porch and talked with Norval Davis until about half-past nine. I went from there to Mr. Satterthwaite's store with Norval. We walked side by side, and I carried the wheel with me. Norval asked Mr. Satterthwaite to carry him to Hyde County, and Mr. Satterthwaite agreed to do it. I left about the same time they did. I rode my wheel. It was about 10 o'clock. I did not pass anybody. The only time I saw Mrs. Williams that morning was through the window. That was about 7 o'clock in the morning. When I got back I put my wheel over the fence. Mr. Williams was drinking some water from the kitchen well five or six steps from the kitchen. Mr. Williams asked me if I wanted anything. I told him I wanted some candy. He told me, "I haven't anything very much for you to do," and gave me a bush hook to work on the ditch. After I came out of the shop, I looked up the road and saw Dr. Mariner coming in. I went on down the field to go to Norval Davis's around 7 o'clock in the morning. I did not see Mrs. Williams. On my way back from Satterthwaite's store I did not see anybody. I worked in the field two hours, from 10 to 12. I stopped at 12 o'clock and walked out with Haywood. I asked him if he thought I had time to go home and get dinner. He said, yes, if I didn't take too long to eat. I didn't go back to work for Mr. Williams that afternoon, because I stopped to get my corn, some new corn I wanted to plant. I worked for Mr. John Craddock that evening, and on Saturday I went to Leechville. Saturday evening I went to Belhaven; coming back I went to Mr. Williams's. I saw Mr. Williams, Mrs. Williams, and their mother. I bought some baking powder. I went to Belhaven with Mr. Williams Sunday morning. We went to see the conjure doctor. I don't know a thing about the crime against Mrs. Williams." There was evidence tending to corroborate the prisoner's theory.
In rebuttal, a witness for the State, Lesofsky, said: "I had a conversation with Ed. Dill about this matter while he was in the jail at Belhaven. I have known Dill for 20 years. I saw a crowd and went to the jail. I didn't know who it was at the time, but found it was Ed. Dill. There was a crowd on the corner, two or three, or more. *Page 649 
There was nobody there except me and him, when I spoke to him. I went to see him just for curiosity. No one heard the conversation except him and me. Nothing said by me, or anybody, by way of threats or inducements. I said, `Ed., what in the devil are you doing in here?' He said, `I was drunk, I got a white woman, and the white woman said I done something to her, but I wouldn't dispute her word.' I didn't say anything to him then. He was sober and not frightened."
During the progress of the trial, as a matter of caution, we presume, the prisoner's counsel entered of record twenty-one exceptions, but they have restricted their brief to a consideration of only five. All not included in the brief are deemed to be abandoned. Rule 34, 174 N.C. 837; Amended Rule, 182 N.C. 922; S. v. Freeman, 146 N.C. 615; Britt v. R.R., 148 N.C. 37; S. v. Spivey, 151 N.C. 679.
The first to be considered is exception 17. The charge was concluded in the afternoon, and after deliberating three or four hours, the jury returned to the court room and one of the jurors requested that the testimony of the prosecutrix be read by the stenographer. The court thereupon cautioned the jury that they must rely upon their recollection, and that the reading of the testimony should be permitted only for the purpose of refreshing their memory. The stenographer then read the evidence of the prosecutrix taken on the direct examination, whereupon the juror who had made the request said, "That is all I want." The prisoner excepted because the court did not require the stenographer to read the evidence taken on cross-examination, and the testimony of the witnesses who had been examined by the defense. The prisoner and his counsel were present, and they neither made request to this effect nor intimated disapproval of his Honor's order or instruction. Surely this exception is entirely without merit. The prisoner's silence may well be deemed a waiver of his right to object after the verdict is returned. Davis v. Keen, 142 N.C. 502;Simmons v. Davenport, 140 N.C. 407; S. v. Yates, 155 N.C. 455; S. v.Willoughby, 180 N.C. 677.
Exception 18: At the same time a juror requested further instruction as to the legal effect of Mrs. Williams's delay in telling her husband of the assault. The prisoner excepted to this instruction: "The mere fact that she delayed in making her statement does not in itself discredit her testimony." His Honor had previously said that her delay was a circumstance to be considered in determining her credibility, and subsequently, that her conduct after the alleged assault should be weighed *Page 650 
in finding whether she had told the truth — in finding whether it impaired, discredited, or corroborated her testimony. The exception must be overruled. Where the charge taken in its entirety fairly and correctly presents the law it will afford no ground for reversing the judgment, even if an isolated expression should be found to be technically inaccurate. S.v. Exum, 138 N.C. 602; Hodges v. Wilson, 165 N.C. 323; White v. Hines,182 N.C. 289.
Exceptions 19, 20: In response to a juror's inquiry, the court instructed the jury to consider the environment, training, and experience of the prosecutrix, while investigating the reason of her delay in making known the assault, and to ascertain from the evidence whether her conduct was attributable to her temperament or to some other cause. The prisoner excepted to the instruction on the ground that the court emphasized the State's contention regarding her failure to make outcry without sufficient explanation of the circumstances on which the prisoner relied. But a careful perusal satisfies us that the charge, instead of being subject to this criticism, embodies a clear presentation of the circumstances relied on to establish the defense. Besides, the prisoner made no request for more specific instructions or for a more definite statement of his contentions on any phase of the evidence. Simmons v. Davenport, supra; S. v. Yates,supra.
The ninth is the prisoner's cardinal exception. It is made to rest upon the decision in S. v. Stines, 138 N.C. 686, and is addressed to his Honor's modification of a requested instruction that it was incumbent on the State, if it could do so, to show that the prosecutrix made outcry soon after the occurrence, and that her failure to do so was a suspicious circumstance, tending to impeach her credibility. The instruction given was as follows: "It has been suggested that it was incumbent upon the State, if it could do so, to show that the prosecutrix made an outcry at or shortly after the occurrence; and her failure to do so from Thursday morning until Sunday night, and keeping to herself the facts of the assault, unless satisfactorily explained to you by the evidence, would be a suspicious circumstance against her as to the credibility of her testimony. The fact, however, that she made no disclosure to any person from Thursday until Sunday does not mean that you must disregard her testimony, but it is a fact and circumstance to be considered by you as to what effect you ought to give it in determining the credibility of her testimony." The prisoner excepted to the interpolation of the phrase "unless satisfactorily explained to you by the evidence."
In the History of the Pleas of the Crown, 633, Sir Matthew Hale said: "The party ravished may give evidence upon oath, and is in law a competent witness; but the credibility of her testimony, and how far *Page 651 
forth she is to be believed, must be left to the jury, and is more or less credible according to the circumstances of fact that concur in that testimony.
"For instance, if the witness be of good fame, if she presently discovered the offense and made pursuit after the offender, showed circumstances and signs of the injury, whereof many are of that nature, that only women are the most proper examiners and inspectors, if the place wherein the fact was done was remote from people, inhabitants, or passengers, if the offender fled for it; these and the like are concurring evidences to give greater probability to her testimony, when proved by others as well as herself.
"But on the other side, if she concealed the injury for any considerable time after she had opportunity to complain, if the place where the fact was supposed to be committed were near to inhabitants, or common recourse or passage of passengers, and she made no outcry when the fact was supposed to be done, when and where it is probable she might be heard by others; these and the like circumstances carry a strong presumption that her testimony is false or feigned." See East's Pleas of the Crown, 445; 4 Bl. Com., 214. The principle crystallized in Hale's statement has received the approval of eminent jurists; but the words "strong presumption" must not be accepted as implying a rule or presumption of law, but merely an inference of fact. The origin of the rule admitting evidence of the woman's timely disclosure or failure to complain is involved in doubt. By some the admission of such evidence is said to be a survival of the practice which prevailed in early times of receiving previous statements of a witness not under oath for the purpose of corroboration; and by others, a perverted survival of the rule which required the injured woman to make hue and cry. The latter custom is referred to by Bracton, fol. 147: "When, therefore, a virgin has been so deflowered and overpowered, . . . forthwith and whilst the act is fresh, she ought to repair with hue and cry to the neighboring vills, and there display to honest men the injury done to her, the blood, and her dress stained with blood, and the tearing of her dress; and so she ought to go to the provost of the hundred and to the sergeant of the lord, the king, and to the coroners, and to the viscount." Whatever the origin of the rule, the best of judges in ancient and modern times concur in saying that the woman's conduct is relevant in determining the question of her consent. Evidence that she made outcry tends to show nonconsent, and the want of it is a circumstance to be considered in favor of the accused. Underhill on Cr. Ev., 470, sec. 411; S. v. Peter, 53 N.C. 21. In Peter's case,Pearson, C. J., expressed the idea in the following language: "The fact that the witness Narcissa did not make known or complain of the outrage which had been perpetrated on her *Page 652 
for two weeks was presented to the jury by his Honor as a circumstance which affected her credibility. This portion of the charge is excepted to on the ground that he ought to have gone further and told the jury that her not making an earlier disclosure raised a presumption of falsehood, to be acted on by the jury in the absence of any proof to rebut it.
"It is not a rule of law that silence, under such circumstances, raises a presumption that the witness has sworn falsely. The passages in the books to which reference was made on the argument use the word `presumption,' not as a rule of law, but as inference of fact, and treat of silence as a circumstance tending strongly to impeach the credibility of the witness, on the ground that a forcible violation of her person so outrages the female instinct that a woman not only will make an outcry for aid at the time, but will instantly and involuntarily, after its perpetration, seek some one to whom she can make known the injury and give vent to her feelings. The want of this demonstration of feeling or `involuntary outburst' is treated of as a circumstance tending to show consent on her part; but it is nowhere held that this female instinct is so strong and unerring as to have been made the foundation of a rule of law, as distinguished from a rule in respect to evidence and the weight to which it is entitled, which is a matter for the jury." S. v. Smith, 138 N.C. 700.
While the silence or delay of the prosecutrix in complaining may be urged to lessen the force or credibility of her evidence, it is equally unquestionable that her delay may be explained or excused by proof of sufficient cause therefor. Among causes that have been held to excuse such delay Underhill mentions shame, threats of the prisoner, and fear of injury. Cr. Ev., 470. If in the estimation of the jury the evidence reconciles the woman's silence with her nonconsent — i. e., shows sufficient explanation or excuse — her failure to make complaint should not be deemed a "suspicious circumstance" tending to show that she consented to the act. This we understand to be the sum and substance of his Honor's modified instruction.
The evidence discloses circumstances that are uncommon, if not singular in their kind. The prosecutrix made no outcry, gave no alarm, and uttered no complaint for more than three days; two hours after the occurrence the prisoner was at work in a field near her home; on Saturday he saw the prosecutrix, her husband, and his mother, and on Sunday went with her husband to Belhaven. If the theory of the State be accepted, the prosecutrix, resisting to the utmost, tried to make outcry and could not; afterward she suffered the torture of shame and the fear of death; she was physically injured; and the prisoner practically admitted his guilt. The courts do not presume to reconcile conflicts or inconsistencies of testimony in a judicial proceeding. This duty must *Page 653 
be discharged by another agency of the law. Advocates of the jury system who admit that it does not merit all the encomiums it has received, are pronounced in the conviction that wherever the element of a moral doubt enters into the consideration of a case, it can best be weighed on the balance of probabilities by a proper tribunal. Concerned with the law, the courts are not inclined to disturb this prevailing assurance.
Owing to the gravity of the offense with which the prisoner is charged, we have examined all the exceptions in the record, in favorem vitae, and find
No error.