STATE v. AMY HUGGINS.

(Filed 29 March, 1967.)

**1. Criminal Law § 108—**

The use of the phrase "the State has presented evidence in this case which tends to show" in recapitulating the State's evidence, the same phrase being used in the recapitulation of defendant's evidence, *is held* not to constitute an expression of opinion by the court on the evidence. G.S. 1-180.

**2. Assault and Battery § 15—**

The court's instruction in this case *held* to have adequately presented to the jury defendant's contention of self-defense.

APPEAL by defendant from *Peel, J.,* October 1966 Session of LENOIR.

Criminal prosecution on an indictment charging defendant on 5 October 1965 with feloniously assaulting Geraldine Hill with a deadly weapon, to wit, a rifle, and inflicting upon her serious injury not resulting in death, a violation of G.S. 14-32.

Plea: Not guilty. Verdict: Guilty of an assault with a deadly weapon.

From a judgment of imprisonment for 12 months, defendant appeals.

*Attorney General T. W. Bruton and Assistant Attorney General James F. Bullock for the State.*

*Turner & Harrison by Fred W. Harrison for defendant appellant.*

PER CURIAM. The State's evidence, in brief summary, tends to show the following facts: Geraldine Hill and the defendant Amy Huggins had been having trouble for some time as the result of defendant's dating Geraldine Hill's husband. On 5 October 1965 Geraldine Hill and her husband were not living together. On 5 October 1965 defendant was a widow. Between 9:30 and 10 p.m. on 5 October 1965 Geraldine Hill went to defendant's home in an automobile driven by her sister, Paulette White. Geraldine got out of the automobile, went up on the porch of defendant's home, and knocked at the door. Defendant inside of the house lifted the shade at the window, saw it was Geraldine, and pulled the shade down. She saw her husband run across the floor inside the house, because the shade was flopping where defendant had "slammed it down." Defendant said, "It's your g - - d - - - - wife." After that Geraldine's husband came to the door, opened it, and they were standing in the door talking. ¡Defendant walked· up to the door, stuck a rifle in Geraldine's ribs and pulled the trigger, saying, "I told you I would shoot your g - - d - - - - wife." Defendant slammed the door, and Geraldine fell on the porch. Before she was shot, Geraldine and defendant did not speak to each other. Geraldine's husband and her sister got her in her sister's automobile, which was driven to the hospital. Geraldine was unconscious when she was carried into the hospital. The bullet from the rifle passed through her body. She was in the hospital eleven days.

The State's evidence further tends to show that about four years before 5 October 1965 defendant came to Geraldine Hill's home and said to Geraldine, "I will kill you before I let you tell my husband what I am doing." That was when defendant's second husband was living.

Paulette White, Geraldine's sister, testified in substance: Geraldine's husband came out on the porch, took Geraldine's arm, and said, "Let's go." Geraldine said: "I want that . . . . . to tell me now that she is not going with my husband." We have omitted the vile name that Geraldine called defendant.

Defendant's evidence tended to show the following facts: She and Geraldine Hill were raised near each other, and they had known each other all their lives. They had always disliked each other. She had not dated Geraldine's husband over a half a dozen times. When Amy Huggins came home the night of 5 October 1965, Geraldine's

husband and one Mary Jennings were there. She went into the bath-room and took a bath. After that she was watching television. About 9 p.m. Geraldine Hill came to her house and was knocking at the door. She went to the door, pulled the curtain back, and saw Geraldine standing on the porch. She went to her bedroom to tele-phone the police department, because she had a warrant out for Geraldine's arrest. About a month before, Geraldine had trespassed upon her property, and committed property damage. Before she was able to get the police over the telephone, Geraldine came into her house. Geraldine got half way through her living room, scream-ing at her, pointing her finger at her, and calling her a "black-headed b - - - -." Geraldine was coming at her just as fast as she could, and she had no place to go. She grabbed her rifle and shot her. She did not mean to shoot her; she meant to get Geraldine and her husband out of her house. She wanted Geraldine and her husband to leave, and she was screaming, "Get out, get out," and they were not trying to get out, and the rifle went off. Geraldine fell to the floor. Geraldine had got within a few feet of her in a threatening attitude, and was still coming at her when the rifle fired. She did not mean to shoot; the gun went off. She testified: "I had the gun and the gun went off. Yes, a gun goes off as a result of pulling the trigger, and I suppose I pulled the trigger. The gun was in my hand, and the gun went off. . . . Evidently, I did pull the trigger, Yes, I pulled the trigger. . . . I just had the gun in my hand when it went off. I didn't mean to pull the trigger, but it went off, anyway. . . . The shooting was an accident."

Defendant also offered evidence tending to show the following facts: On Labor Day week end in September 1965, Geraldine Hill, in a conversation with people at the beach at Morehead City, was talking about her husband and defendant. Geraldine would curse her husband and then she would say, "One of these days, I am going to kill both of them." Alpheus White, who is the present husband of defendant, told defendant of this threat made by Geraldine.

The State called in rebuttal Geraldine's husband, Jerry Hill, who is still married to Geraldine. His testimony tends to show that Geraldine was standing on the porch when defendant shot her. He has heard his wife say she was going to beat defendant. He does know that his wife has threatened him.

Defendant assigns as error that the court in its charge used the words, "The State has presented evidence in this case which tends to show," in arraying the evidence offered by the State. She con-tends that in using these words the court expressed an opinion upon the weight of the evidence, in violation of G.S. 1-180. The same ex-pression was used by the court in its charge in reciting defendant's

evidence. This assignment of error is overruled upon the authority of *S. v. Jackson*, 228 N.C. 656, 46 S.E. 2d 858.

Defendant assigns as error that the court failed to comply with the requirements of G.S. 1-180, in that it failed to charge the jury as to the law arising upon the evidence as it related to defendant's legal right to defend her home and to evict trespassers therefrom. Reading the charge of the court in its entirety, it appears that while the judge's charge on the point raised by defendant's assignment of error was not as full and comprehensive as it might have been, yet the charge was adequate under our decisions, and prejudicial error is not shown.

All the other assignments of error have been carefully considered, and are overruled, for the reason that nothing is shown that would justify disturbing the verdict and judgment below. The case presents in essence issues of fact determinable alone by the jury. The verdict and judgment will be upheld.

No error.