STATE OF NORTH CAROLINA v. ALLEN ROBERTS

No. 83

(Filed 13 June 1977)

1. **Criminal Law § 161— assignment of error not supported by exception—no question presented for review**

     Defendant's assignment of error to the denial of his motion to suppress an in-court identification was not supported by an exception duly taken at trial and therefore presented no question for appellate review.

2. **Criminal Law § 66.1— identification of defendant—witness's opportunity for observation**

     Evidence was sufficient to support the trial court's conclusion that a rape victim's in-court identification of defendant was "based upon her independent recollection of the event without suggestion as to identity from any person" where the evidence tended to show that the victim observed defendant for about five seconds when she turned to see who was following her; she observed her assailant in bright sunlight for two to three minutes while he had intercourse with her; and the victim identified defendant from among twenty other black men at the preliminary hearing without having been told where he would be sitting and without having her attention directed to him in any way.

1

State v. Roberts

**3. Criminal Law § 117.1— scrutiny of testimony—instruction not required absent request**

In the absence of a request, the court is not required to give a cautionary instruction that the jury scrutinize the testimony of a witness on the grounds of interest or bias.

**4. Constitutional Law § 35; Criminal Law § 75.11— waiver of rights form—defendant's name printed—waiver effective**

Defendant's contention that a waiver of rights form was ineffectual because defendant printed his name instead of signing it is without merit, since evidence was sufficient to support the trial court's findings that defendant was advised of his rights, said he fully understood those rights, and printed his name on the waiver of rights form.

**5. Criminal Law § 114.2— jury instructions—evidence "tended to show"—no expression of opinion**

Defendant's contention that the trial court erred in instructing the jury on what the evidence presented in the case "tended to show" in that use of the phrase misled the jury into believing that all the evidence restated by the judge was true is without merit, since the court repeatedly reminded the jury that it must determine what the evidence adduced at trial did in fact show, and the trial judge concluded his instructions with the declaration that he did not have any opinion on what the verdict in the case should be.

**6. Criminal Law § 113.1— review of evidence after deliberations begun—discretionary matter**

Generally, in the absence of a statute governing the situation the decision to review evidence after the jury has begun its deliberations rests in the sound discretion of the trial judge.

**7. Robbery § 4— common law robbery—sufficiency of evidence**

Evidence was sufficient to be submitted to the jury in a prosecution for common law robbery where it tended to show that defendant requested his cousin to accompany him to Duke Gardens; during defendant's assault upon his rape victim, the cousin forcibly removed her purse from her arm, and defendant then called to the cousin to bring him the purse; after the assault, the cousin hid the purse and wallet but kept the money, car keys, driver's license and bank book he found inside; when defendant next saw his cousin, he asked what had been done with the purse and demanded items taken from the purse, which the cousin gave him; defendant also warned the cousin not to tell anyone about the robbery or rape; and police later found the victim's car keys in the possession of a girl friend of defendant.

**8. Rape § 5— first degree rape—serious bodily injury—sufficiency of evidence**

Evidence in a first degree rape prosecution was sufficient to support a finding that the victim suffered a serious bodily injury where it tended to show that the victim suffered, at the hands of defendant, a hard blow to her upper jaw that left her stunned and dazed and knocked five teeth out of alignment, breaking the root of one tooth; the teeth had to be deadened, forced back into line and secured with a metal brace which was uncomfortable but

which the victim wore for six weeks; and expert medical opinion predicted that the teeth would eventually die, despite the brace, and root canals or extraction would then be necessary.

9. **Rape § 1— first degree rape—resistance overcome by serious bodily injury— meaning of statute**

G.S. 14-21(a)(2), the rape statute, does not mean that the victim's resistance must completely cease in order to be "overcome" by infliction of serious bodily injury; rather, the statute means that the assailant is guilty of first degree rape if the rape is accomplished by force and against her will after the victim's resistance is rendered ineffectual by the infliction of serious bodily injury.

10. **Constitutional Law § 63— exclusion of jurors opposed to death penalty—death penalty invalidated—exclusion not error**

Defendant's contention in a first degree rape prosecution, made in reliance upon *Witherspoon v. Illinois*, 391 U.S. 510, that his constitutional rights were violated by the exclusion of jurors who expressed scruples against the death penalty is groundless, since the death penalty provisions of G.S. 14-21(a)(2) were, by implication, invalidated by *Woodson v. North Carolina*, 428 U.S. 280, and the *Witherspoon* decision affected only the death sentence and not the conviction.

11. **Constitutional Law § 80; Rape § 7— first degree rape—life imprisonment substituted for death penalty**

A sentence of life imprisonment is substituted for the sentence of death imposed upon defendant convicted of first degree rape.

APPEAL by defendant from judgments of *Canaday, J.*, 10 February 1975 Session, DURHAM Superior Court. This case was argued as Case No. 21 at the Fall Term 1975.

On separate indictments, proper in form, defendant was charged with first degree rape and common law robbery of Maureen Elizabeth Fahey on 10 June 1974 in Durham County.

Maureen Elizabeth Fahey, twenty-six years of age, testified that she was employed at the Duke University Media Center as an assistant producer-director. On the afternoon of 10 June 1974 she left her office at the Old Chemistry Building about 5:30 p.m. and walked to the Perkins Library where she remained until 7:40 p.m. Upon leaving the library, she decided to take a shortcut through the Sarah Duke Gardens to reach her home near the campus. The weather was clear and sunny and several people were observed in the gardens which did not close until 8 p.m. While walking through the gardens Miss Fahey became aware of two people behind her. Glancing around, she observed two young

black males, later identified as defendant in this case and his cousin John Holeman, walking at a normal pace. She continued walking, immediately heard running footsteps, and was grabbed from behind by defendant and struck on the side of her mouth. Despite her screams and struggles, defendant dragged her about fifteen feet toward some bushes and pushed her to the ground. John Holeman grabbed her purse and sat down nearby to rummage through it despite defendant's instructions that Holeman bring the purse to him. Miss Fahey continued to struggle and scream at defendant to leave her alone. Defendant repeatedly told her to shut up and then struck her in the upper left jaw with his fist, leaving her stunned and dazed. Defendant removed one leg of her pants and, in spite of her repeated calls for help, completed an act of sexual intercourse by force and against her will. Defendant then said to her, "You won't tell anyone about this, will you?" And she replied, "No." Defendant said, "O.K., you can get dressed now." Then defendant and Holeman ran off in the direction of Anderson Street.

Miss Fahey testified further that, after her assailants left, she dressed and walked to Duke Hospital to receive medical attention for her throbbing jaw and her bleeding mouth. There she received ten stitches to close the cut on her mouth and penicillin shots for the pain in her jaw. X-rays taken the next day by an oral surgeon revealed that five teeth had been knocked out of alignment and that one root was completely broken. A metal brace was inserted in her mouth to realign the teeth. She wore the brace for six weeks during which time she could not chew on that side of her mouth and could eat only soft foods.

Miss Fahey described her two assailants to the Durham Police as two light skinned young black men wearing jeans and T-shirts. She specifically remembered the prominent jaw and short Afro haircut of the defendant. She identified her purse and the contents that were stolen, to wit: wallet containing approximately one dollar, eyeglasses, credit cards, driver's license, hairbrush and a set of jewelry screwdrivers.

Dr. Claude Joseph Hearn, the practicing oral surgeon who treated Miss Fahey, corroborated her testimony concerning the brace and the injuries to her teeth. Dr. Hearn stated that in his opinion the five teeth partially dislodged by defendant's blow would die, necessitating the performance of root canals or the extraction of the teeth.

Dr. Bruce Romig, Chief Resident in Obstetrics and Gynecology at Duke Hospital, testified that he examined Miss Fahey on 10 June 1974 and found superficial abrasions on her back, arms and legs, in addition to the laceration on her mouth and the misaligned teeth. A pelvic examination revealed the presence of sperm.

John Holeman, a witness for the State, testified that he was fourteen years of age and a first cousin of the defendant. On 10 June 1974 defendant came to his home and asked him to accompany defendant to Duke. They went by a local swimming pool and then to the Sarah Duke Gardens where they began taking pennies out of the wishing well located there. Leaving the wishing well, they spotted Miss Fahey below the steps that lead to the parking lot on Anderson Street. Defendant voiced his intention to rape her and the two began jogging to overtake her. Defendant then grabbed Miss Fahey around the neck and struck her in the mouth as she struggled to free herself. He dragged her toward some bushes and wrestled her to the ground, striking her in the jaw when she continued to scream and struggle. During the assault Holeman grabbed the pocketbook off her arm and sat down nearby to rummage through it. After defendant had completed his act of sexual intercourse with Miss Fahey, he asked Holeman if he "wanted any" but Holeman said no. Holeman testified that he then took her money, keys, driver's license and bank book and hid the wallet and purse nearby.

Holeman admitted on cross-examination that his hearing in juvenile court on this matter had resulted in only a warning to stay out of trouble. Since that time, however, he was placed on probation for larceny and a sexual assault on a minor boy.

Detective H. L. Hayes, of the Durham Police Department, testified that he received a call about 9 p.m. on 10 June 1974 to investigate a rape in Duke Gardens. When he first interviewed Miss Fahey she appeared very upset. Her jaw was swollen and the left side of her mouth was bleeding. She told Detective Hayes what had happened and her narration to the officer was substantially the same as her testimony on the witness stand. She described her assailants to Officer Hayes as Negro males and said defendant wore jeans, a light colored T-shirt and had high cheekbones.

Detective Hayes further testified that in response to an anonymous telephone call on 12 June 1974 he went to 1030 More-

land Street in Durham where he found John Holeman and defendant sitting on the front porch. Defendant attempted to elude arrest but was captured about thirty minutes later. Holeman signed a waiver of rights and gave the police a statement which corroborated his testimony at trial. Then he took the police to a creek near Anderson Street where he had hidden the victim's pocketbook.

Following a voir dire at which the trial court heard evidence, found facts, and determined that defendant had knowingly and voluntarily waived his constitutional right to remain silent and signed a written waiver of rights, Detective Hayes testified that defendant denied any part in the crime until confronted with the inculpatory statement by John Holeman. At that point defendant related to the officers the events leading up to the assault on Miss Fahey. With respect to the assault itself defendant declined to narrate any details, stating only: "Well, whatever John told you that is the way it happened."

Defendant offered no evidence. Defendant was convicted of rape in the first degree and common law robbery as charged in the bills of indictment. He was sentenced to death for rape and to a term of not less than eight nor more than ten years for the robbery with credit for time spent in custody awaiting trial. He appealed both cases to the Supreme Court but was unable to docket the record on appeal within the time prescribed by the rules and on 5 June 1975 we allowed certiorari to bring up the late appeal. Errors assigned will be discussed in the opinion.

*Rufus L. Edmisten, Attorney General; William B. Ray, Assistant Attorney General; William W. Melvin, Special Deputy Attorney General, for the State of North Carolina.*

*Henry D. Gamble, attorney for defendant appellant.*

HUSKINS, Justice.

[1, 2] Defendant first assigns as error the denial of his motion to suppress the in-court identification of defendant by Miss Fahey. Defendant contends the prosecutrix saw her assailant for only two or three minutes during which time she was beaten about the face. Therefore, defendant argues, Miss Fahey is not competent to identify him as her assailant. This assignment is not supported by an exception duly taken at trial and therefore presents no question for appellate review. *State v. Green*, 280 N.C. 431, 185 S.E.

2d 872 (1972); *State v. Jacobs*, 278 N.C. 693, 180 S.E. 2d 832 (1971); 1 Strong, N.C. Index 2d, Appeal and Error § 24. Nevertheless, upon examination we find the identification of defendant by Miss Fahey clearly competent and admissible.

On voir dire the victim testified that she had twenty-twenty vision when wearing her contacts and that she was wearing her contact lenses on 10 June 1974 as she walked through Duke Gardens in bright sunlight. She observed defendant for about five seconds when she turned to see who was following her. She observed him again for two to three minutes while he dragged her into some bushes and had sexual intercourse with her. On 1 July 1974 she identified defendant at his preliminary hearing. At that time he was sitting among approximately twenty other blacks in the courtroom. She had not been told where he would be sitting and her attention had not been directed to him in any way. She recognized defendant by his prominent jawline and facial expressions. David LaBarre, defendant's former attorney in this matter, also testified on voir dire that the prosecutrix identified defendant at the preliminary hearing on 1 July 1974. On cross-examination Miss Fahey said she told LaBarre that she had not been shown any pictures of defendant or viewed him in a lineup prior to the hearing, and LaBarre testified he had no knowledge of any acts on the part of any person which would tend to suggest to the prosecutrix that defendant was her assailant.

The trial court made findings of fact and then concluded that ". . . the identification by the prosecutrix of the defendant as the person who allegedly assaulted her was and is based upon her independent recollection of the event without suggestion as to identity from any person." The trial court's findings were amply supported by competent evidence and are therefore binding on this Court. *State v. Alford*, 289 N.C. 372, 222 S.E. 2d 222 (1976); *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974); *State v. Stepney*, 280 N.C. 306, 185 S.E. 2d 844 (1972).

[3] By his next assignment of error, defendant contends the trial court erred in permitting Holeman to testify to statements made by defendant before, during and after the rape of Miss Fahey. More specifically, defendant contends that, in light of Holeman's statement on cross-examination that he had received only a warning to stay out of trouble as a result of his participation in the

alleged crimes, the trial court should have instructed the jury to scrutinize Holeman's testimony as that of an interested witness. No request for such an instruction was made by defendant and, in the absence of a request, the court is not required to give a cautionary instruction that the jury scrutinize the testimony of a witness on grounds of interest or bias. *State v. Vick*, 287 N.C. 37, 213 S.E. 2d 335 (1975), *cert. den.*, 423 U.S. 918 (1975); *State v. Brinson*, 277 N.C. 286, 177 S.E. 2d 398 (1970). This assignment of error is overruled.

The trial court, after a voir dire hearing, denied defendant's motion to suppress evidence pertaining to in-custody statements to the police. Defendant assigns the denial of this motion as error.

**[4]** The trial court found that prior to interrogation of the defendant, Officer Hayes of the Durham Police Department fully advised defendant of his constitutional rights; that defendant said he fully understood these rights, did not want an attorney present, and that he would make a statement. Defendant then signed the waiver of rights form in Officer Hayes' presence, after which he recounted the events leading up to the assault of Miss Fahey. Concerning the rape itself, defendant stated only, "Well, whatever John told you, that is the way it happened." Against the advice of counsel, defendant refused to testify on voir dire. He now urges to this Court that the waiver is ineffectual because it is not signed but printed. This contention is feckless. Officer Hayes testified on voir dire that some defendants sign the form while others print their names and that defendant willingly and without fear of punishment or hope of reward printed his name on the waiver form in his presence. We fail to see any legal significance in the fact that defendant printed his name instead of signing it. Judge Canaday's findings are supported by competent evidence and the findings in turn support his conclusions that a voluntary and knowing waiver of rights occurred. Consequently, his denial of the motion to suppress is conclusive on appeal. *State v. Simmons*, 286 N.C. 681, 213 S.E. 2d 280 (1975); *State v. McRae*, 276 N.C. 308, 172 S.E. 2d 37 (1970). *See also State v. Patterson*, 288 N.C. 553, 220 S.E. 2d 600 (1975); G.S. 7A-457(c) (Cum. Supp. 1975).

**[5]** Defendant next contends the trial court erred in instructing the jury on what the evidence presented in the case "tends to show" in that use of this phrase misleads the jury into believing

that all the evidence restated by the judge is true. This contention is without merit. *State v. Huggins*, 269 N.C. 752, 153 S.E. 2d 475 (1967); *State v. Jackson*, 228 N.C. 656, 46 S.E. 2d 858 (1948); 3 Strong, N.C. Index 2d, Criminal Law § 114. The record reveals repeated reminders to the jury that *it* must determine what the evidence adduced at trial did in fact show. In addition, the trial judge concluded his instructions with the declaration that he did not have any opinion on what the verdict in the case should be. This assignment is overruled.

[6]  After jury deliberations had begun, the jury returned to the courtroom to request a repetition of the definitions of first and second degree rape and to ask what recourse existed when members of the jury remembered different versions of certain testimony. The court reiterated the definitions but refused to review any of the evidence, giving only the following instruction:

> ". . . [L]adies and gentlemen, as I instructed you during the charge, you are the sole triers of the facts. You must determine what those facts are and any differences of recollection with respect to the facts, any differences in evaluation of those facts must be resolved among yourselves."

Defendant now assigns as error the trial court's refusal to review the evidence, contending the trial court should have inquired into the source of the jury's confusion. As defendant lodged no objection to the court's instruction, his assignment of error on appeal is to no avail. *State v. Green, supra; State v. Jacobs, supra. See also State v. Dill*, 184 N.C. 645, 113 S.E. 609 (1922). Even were this assignment properly presented, we note it is generally held that in the absence of a statute governing the situation the decision to review evidence after the jury has begun its deliberations rests in the sound discretion of the trial judge. *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976). *See generally* Annot., 50 A.L.R. 2d 176 (1956). Although a review of certain evidence might have proved helpful to the jury, we will not presume prejudice from the court's refusal to refresh the jurors' recollections and defendant has shown none. This assignment is overruled.

[7]  Concerning his conviction for common law robbery, defendant brings forward two assignments of error: first, that his

motion as of nonsuit was erroneously denied and second, that the trial court erred in its instructions on common law robbery.

It is elementary that a motion as of nonsuit requires the trial court to consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom. *State v. Caron*, 288 N.C. 467, 219 S.E. 2d 68 (1975); *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971). If there is evidence, whether direct, circumstantial or both, from which the jury could find that the offense charged has been committed and that defendant committed it, the motion as of nonsuit should be overruled. *State v. Caron, supra; State v. Cooke*, 278 N.C. 288, 179 S.E. 2d 365 (1971); *State v. Goines*, 273 N.C. 509, 160 S.E. 2d 469 (1968). The evidence here tends to show that defendant requested Holeman to accompany him to Duke Gardens; that during defendant's assault on Miss Fahey, Holeman forcibly removed her pocketbook from her arm and that defendant then called to Holeman to bring him the purse and covered Miss Fahey's mouth to stop her screaming. After the assault, Holeman hid the pocketbook and wallet but kept the money, car keys, driver's license and bank book he found inside. When defendant next saw Holeman, he asked what had been done with the purse and demanded the items taken from the purse, which Holeman gave to him. Defendant also warned Holeman not to tell anyone about the robbery or rape of Miss Fahey. The Durham Police later found Miss Fahey's car keys in the possession of a girl friend of defendant. We hold this evidence sufficient to carry to the jury the question of defendant's guilt or innocence of the crime of common law robbery. The motion for nonsuit was properly denied.

Defendant's assignment of error challenging the definition of common law robbery is broadside and unsupported by any argument, reason or authority brought forward in defendant's brief. Therefore, under Rule 28, Rules of Appellate Procedure, 287 N.C. 671, this assignment of error is deemed abandoned. *State v. Stanley*, 288 N.C. 19, 215 S.E. 2d 589 (1975); *State v. Bumgarner*, 283 N.C. 388, 196 S.E. 2d 210 (1973).

Defendant advances several assignments of error challenging his conviction of first degree rape. Specifically, he contends that his motion to reduce the charge to second degree rape or his motion as of nonsuit on the first degree charge should have been

granted and that the court erred in its instructions on first degree rape.

Our present rape statute, enacted in 1973 and applicable to crimes of rape committed after 8 April 1974, provides:

"§ 14-21. Rape; punishment in the first and second degree. — Every person who ravishes and carnally knows any female of the age of 12 years or more *by force and against her will,* or who unlawfully and carnally knows and abuses any female child under the age of 12 years, shall be guilty of rape, and upon conviction, shall be punished as follows:

(a) First-Degree Rape —

(1) If the person guilty of rape is more than 16 years of age, and the rape victim is a virtuous female child under the age of 12 years, the punishment shall be death; or

(2) If the person guilty of rape is more than 16 years of age, *and the rape victim had her resistance overcome or her submission procured* by the use of a deadly weapon, or *by the infliction of serious bodily injury to her,* the punishment shall be death.

(b) Second-Degree Rape. — Any other offense of rape defined in this section shall be a lesser-included offense of rape in the first degree and shall be punished by imprisonment in the State's prison for life, or for a term of years, in the discretion of the court." (Emphasis added.)

Defendant's argument, reduced to its essentials, is simply that the prosecutrix here did not suffer "serious bodily injury," or, if she did, this injury did not overcome her resistance or procure her submission, as required by the statute.

Defendant contends that the phrase "serious bodily injury" should be given a strict interpretation and, in accord with this contention, defendant submitted two requests for instructions.

The first requested the trial court to define "serious bodily injury" for the jury as follows:

"An injury is a serious bodily injury if incapacitation, permanent physical impairment, loss of eyesight or disfigurement results."

The second, apparently an alternative, requested the trial court to give the following instruction:

"In order to find the defendant guilty of first-degree rape you must find that the victim had her resistance overcome or her submission procured by the infliction of serious bodily injury. To find that an injury is serious you must find more than just that force was used or that the rape was against the will of the woman. The injury must be grave in order to be serious, not just trivial. The phrase 'serious bodily injury' means an injury the consequence of which is so grave or serious that it is regarded as differing in kind, and not merely in degree, from other bodily injury. An injury which creates a substantial risk of fatal consequences is a 'serious bodily injury.' The permanent or protracted loss of the function of any important member or organ is also a 'serious bodily injury.'

If you find that the defendant inflicted serious bodily injury on the victim, then you must continue with your deliberations, and before you find the defendant guilty of first-degree rape, you must find that as a result of the injury the victim stopped resisting or that the victim submitted as a result of the injury."

The trial court gave the following instruction:

"Now, ladies and gentlemen, serious bodily injury may be defined as being such physical injury to the person as may, but not necessarily must, result in death, resulting from an assault upon the person. Now, the injury must be serious, but must fall short of causing death.

Now, whether such serious injury has been inflicted in this case must be determined by you, the jury, from the evidence in the case. This is a matter solely for your determination, as to whether or not serious injury has been inflicted in this case."

It is clear, as defendant contends, that "serious bodily injury" is not the equivalent of "by force and against her will." The latter element has long been present in our rape statutes, *see, e.g., State v. Jesse*, 20 N.C. 95 (1838), and is still sufficient to support a conviction of second degree rape under G.S. 14-21(b) (Cum. Supp. 1975). The force necessary to meet the latter requirement, as explained on numerous occasions by this Court, need not be physical force but may take the form of fear, fright or coercion. *State v. Hines*, 286 N.C. 377, 211 S.E. 2d 201 (1975); *State v. Primes*, 275 N.C. 61, 165 S.E. 2d 225 (1969). The mere *threat* of serious bodily harm which reasonably induces fear thereof constitutes the requisite force. *State v. Burns*, 287 N.C. 102, 214 S.E. 2d 56 (1975); *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974).

A conviction of *first degree rape*, however, requires not only the carnal knowledge of a female "by force and against her will" but also the use of a deadly weapon or the infliction of "serious bodily injury" which overcomes the victim's resistance or procures her submission. *See State v. Dull*, 289 N.C. 55, 220 S.E. 2d 344 (1975).

It is not contended by the State that a deadly weapon was used, nor is there evidence of such use. Defendant's conviction of first degree rape must therefore stand on the contention that the victim's resistance was overcome by the infliction of serious bodily injury. "Serious bodily injury," as required by G.S. 14-21(a)(2) (Cum. Supp. 1975), has never been defined by this Court; however, some guidance to the meaning of the phrase can be found by reference to our cases construing G.S. 14-32 (assault with a deadly weapon with intent to kill inflicting serious injury) and by viewing similar cases from other jurisdictions.

The leading case in North Carolina defining "serious injury" under G.S. 14-32 appears to be *State v. Jones*, 258 N.C. 89, 128 S.E. 2d 1 (1962), where Justice Higgins, speaking for the Court, stated:

". . . The term 'inflicts serious injury' means physical or bodily injury resulting from an assault with a deadly weapon with intent to kill. The injury must be serious but it must fall short of causing death. Further definition seems neither wise nor desirable. Whether such serious injury has been inflicted

must be determined according to the particular facts of each case."

This statement was approved in *State v. Ferguson*, 261 N.C. 558, 135 S.E. 2d 626 (1964).

In *State v. Jones, supra*, the Court held that where the prosecuting witness was shot in the back with a .410 shotgun loaded with birdshot and went to a hospital where seventeen shots were removed, the evidence was sufficient to go to the jury on the question of serious injury.

In *State v. Ferguson, supra*, the State's evidence tended to show that the defendant, in a pickup truck, rammed the back of an automobile driven by the prosecuting witness, causing him to suffer a whiplash injury. The prosecuting witness testified that as a result of the injury he could not turn his head without pain; that he had periodic pains in his legs causing them to cramp and hurt; and that he had visited the doctor on two occasions but had not been hospitalized. This Court, finding that an injury of this nature "may or may not be a serious injury, depending upon its severity and the painful effect it may have on the injured victim," concluded that the evidence was sufficient to go to the jury on the question of serious injury.

Knife wounds requiring sixty-four stitches to close were held, in *State v. White*, 270 N.C. 78, 153 S.E. 2d 774 (1967), to be sufficient to support a finding of serious injury. *See also State v. Hefner*, 199 N.C. 778, 155 S.E. 879 (1930); *State v. Roseman*, 108 N.C. 765, 12 S.E. 1039 (1891); *State v. Shelly*, 98 N.C. 673, 4 S.E. 530 (1887).

Other jurisdictions have taken a similar approach where a finding of serious bodily injury was an essential element of assault. Thus it is said that "the words 'serious bodily injury' are words of ordinary significance, and it is not required that the court define the term in the instructions since they are well understood by any jury of ordinary intelligence." *State v. Perry*, 5 Ariz. App. 315, 426 P. 2d 415 (1967); *accord, State v. McKeehan*, 91 Idaho 808, 430 P. 2d 886 (1967); *Andrason v. Sheriff, Washoe County*, 88 Nev. 589, 503 P. 2d 15 (1972); *Le Barge v. State*, 74 Wis. 2d 327, 246 N.W. 2d 794 (1976).

In *State v. Perry, supra*, the court held that evidence of a two and one-half inch cut, a black eye and a broken rib suffered by the prosecuting witness was sufficient to support a finding of

serious injury. The Pennsylvania court, in *Commonwealth v. Alexander*, 237 Pa. Super. 111, 346 A. 2d 319 (1975), noting the special dangers of blows to the head, held that evidence of a broken nose, two black eyes and other head wounds requiring stitches adequately supported a finding of serious injury. *C.f. State v. Miller*, 16 Ariz. App. 92, 491 P. 2d 481 (1971) (bruise on ear, abrasions on hand and knee, and jaw fractured); *State v. McKeehan, supra* (bruises, swelling, cuts and eye injury); *Andrason v. Sheriff, Washoe County, supra* (kick in the groin left the victim unconscious and with area swollen and black and blue); *Le Barge v. State, supra* (twelve wounds needing stitching and minor cuts, abrasions and bruises).

*Brooks v. Sheriff, Clark County*, 89 Nev. 260, 510 P. 2d 1371 (1973), involved a Nevada rape statute requiring a finding that the victim suffer "substantial physical injury" in order to convict defendant of a particular grade of the crime. The court there held that evidence of a cut on the head, swollen eyes and a swollen head was sufficient to support such a finding.

[8]   Here, the evidence reveals injuries similar in nature and extent to those deemed serious in the cited cases. Miss Fahey suffered a hard blow to her upper jaw that left her stunned and dazed and knocked five teeth out of alignment, breaking the root of one tooth. These teeth had to be deadened, forced back into line and secured with a metal brace. Dr. Claude Joseph Hearn, who treated Miss Fahey, testified as follows concerning the injury to her teeth:

"I first saw Miss Fahey on June 12, 1974, in the oral surgery area at Duke Hospital. She had a metallic bar, which was maintained along the upper left teeth, from approximately the front left lateral and sides, or back, to the posterior teeth in order to maintain in position two previously knocked out, rather loosely hanging teeth, which were fractured, one in the root area. The bar actually is put on much as a cast might be put on a broken arm or extremity, so that stabilization would afford the teeth, in this case, a chance to replant themselves in the jawbone. One tooth was fractured in the root structure of the tooth itself, the socket structure. It was a complete fracture, the root was actually separated.

Miss Fahey remained my patient for six weeks. She kept this mechanical device in her mouth for six weeks. I stressed

that she stay on a very soft diet, to chew on the opposite side, and to take no chances of, in any way, biting at anything hard enough to dislodge the teeth from the appliance. This device would cause discomfort. After six weeks, I removed the stitches and mechanical device from her mouth.

I have an opinion, based on reasonable medical certainty, that these teeth will die. 'Dying' means that the tooth loses its nerve supply and blood supply such that the tooth actually would become darkened and there would be discoloration. Ultimately the possibility of abcess is always a problem. This is what must be done with the dead teeth: the nerve and blood vessels that go through the center of the root have to be removed and the center of the root canal, that is a root canal is performed. In certain instances the upper part of the root might also have to be removed so that you can clean it and fill the end of the tooth. There is never a guarantee that a root canal will be successful, so there is really no guarantee, but it is the next recourse. The last recourse is extraction of the teeth."

Miss Fahey suffered protracted pain and impairment of function of her jaw and teeth while wearing the metal brace for six weeks. Expert medical opinion predicts these teeth will die, despite the brace, and root canals or actual extraction will be necessary. We hold this evidence sufficient to support a finding that the victim suffered a serious bodily injury.

Defendant's contentions under this assignment, however, have not yet been exhausted. Even assuming that Miss Fahey suffered "serious bodily injury," defendant urges that this did not overcome her resistance or procure her submission as required by G.S. 14-21(a)(2) (Cum. Supp. 1975). Defendant contends that Miss Fahey continued to struggle and scream even after the blow to her jaw and that the rape was accomplished only by virtue of defendant's superior strength, not because Miss Fahey stopped resisting as a result of the injury.

This contention is absurd and wholly without merit. There is abundant evidence that Miss Fahey's resistance was overcome by the injuries she sustained. In her testimony she stated that, after defendant dragged her toward the bushes, "[h]e hit me in the upper left-hand jaw with his fist. I was stunned and dazed and

scared they might kill me." The testimony of defendant's ac-
complice, Holeman, is even more to the point. He states:

> "While she was struggling, trying to get loose from him,
> he took and hit her. She was still struggling so I took and
> grabbed the pocketbook off her arm. Defendant hit her in the
> jaw with his fist. While he was dragging her toward the
> woods, I was looking through the pocketbook. Defendant hit
> her again in the jaw with his fist because she was still try-
> ing to get loose. After he got her down, he started taking her
> clothes and stuff off. She was calling the police and stuff.
> Robert hit her in the jaw with his fist again because she was
> trying to raise up. Her mouth started bleeding."

[9] When the statute is correctly interpreted and applied, this
evidence is sufficient to support a conviction of rape in the first
degree. G.S. 14-21(a)(2) (Cum. Supp. 1975) does not mean that the
victim's resistance must completely cease in order to be "over-
come" by infliction of serious bodily injury. The statute means
that the assailant is guilty of first degree rape if the rape is ac-
complished by force and against her will after the victim's
resistance is rendered ineffectual by the infliction of serious bodi-
ly injury. Defendant's motion for nonsuit on the charge of first
degree rape was therefore properly denied.

[10] By his next assignment of error, defendant, relying on
*Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct.
1770 (1968), contends that his constitutional rights were violated
by the exclusion of jurors who expressed scruples against the
death penalty. In light of the holding in *Woodson v. North
Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976), the
death penalty provisions of G.S. 14-21(a)(2) (Cum. Supp. 1975),
have, by implication, been invalidated. *State v. Thompson*, 290
N.C. 431, 226 S.E. 2d 487 (1976). As the *Witherspoon* decision af-
fected only the death sentence and not the conviction, defendant's
contention is groundless. *See State v. Montgomery*, 291 N.C. 235,
229 S.E. 2d 904 (1976); *State v. Covington*, 290 N.C. 313, 226 S.E.
2d 629 (1976). This assignment is overruled.

[11] On 2 July 1976 the Supreme Court of the United States in
*Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct.
2978, invalidated the death penalty for murder as provided by
G.S. 14-17 (Cum. Supp. 1975). By implication, *Woodson* also in-
validated the death penalty for first degree rape as provided in

G.S. 14-21(a)(2) (Cum. Supp. 1975), the statute under which defendant was indicted; convicted and sentenced to death. *State v. Thompson, supra.* Therefore the judgment in Case No. 74-CR-12595 which imposed a sentence of death upon defendant Allen Roberts is vacated and a sentence of life imprisonment is substituted in lieu thereof under authority of section 7, chapter 1201 of the 1973 Session Laws (1974 Session).

Our examination of the entire record discloses no error affecting the validity of the verdicts returned by the jury. The trial and verdicts must therefore be upheld. To the end that a sentence of life imprisonment may be substituted in lieu of the death sentence heretofore imposed, Case No. 74-CR-12595 is remanded to the Superior Court of Durham County with directions (1) that the presiding judge, without requiring the presence of defendant, enter judgment imposing life imprisonment for the first degree rape of which defendant has been convicted; and (2) that in accordance with said judgment the clerk of superior court · issue commitment in substitution for the commitment heretofore issued. It is further ordered that the clerk furnish to the defendant and his counsel a copy of the judgment and commitment as revised in accordance with this opinion.

In Case No. 74-CR-18760: No Error.

In Case No. 74-CR-12595: No Error in the Verdict; Death Sentence Vacated.