STATE OF NORTH CAROLINA v. JAMES W. HUTCHINS

No. 80

(Filed 8 July 1981)

1. **Constitutional Law § 48— effective assistance of counsel**

The competency of a criminal defendant's counsel does not amount to a denial of the constitutional right to counsel unless it is established that the attorney's representation was so ineffective that it rendered the trial a farce and a mockery of justice.

2. **Constitutional Law § 46— indigent defendant—appointment of replacement counsel**

In the absence of any substantial reason for the appointment of replacement counsel, an indigent defendant must accept counsel appointed by the court, unless he wishes to present his own defense.

3. **Constitutional Law § 46— indigent defendant—replacement counsel—disagreement over tactics—dissatisfaction with counsel**

A disagreement over trial tactics does not, by itself, entitle a defendant to the appointment of new counsel; nor does a defendant have the right to insist that new counsel be appointed merely because he has become dissatisfied with the attorney's services.

4. **Constitutional Law § 48— effective assistance of counsel—time spent with accused**

The effectiveness of representation cannot be gauged by the amount of time counsel spends with the accused, but such a factor is one consideration to be weighed in evaluating the effectivenes of counsel.

5. **Constitutional Law § 46— indigent defendant—refusal to replace counsel—effective assistance of counsel—alleged failure to visit defendant often enough**

In this prosecution of defendant upon three charges of first degree murder, defendant was not denied the effective assistance of counsel by the trial court's denial of defendant's motion for removal of his court appointed attorneys and appointment of substitute counsel where the only reason defendant articulated for wishing to have his attorneys discharged was because of his stated belief that they had not visited him enough to discuss the case with him; the record indicates that defense counsel had been diligent in all respects regarding their preparation for trial; there was no indication that the frequency of contact with defendant resulted in defendant being misinformed about the progress of the case; there was no suggestion that the level of contact affected adversely the attorneys' preparation for trial; and there was no evidence that defense counsel were unable to mount a defense which would be consistent with the concept of effective representation.

6. **Constitutional Law § 45— warning of right to appear pro se not required**

The trial court had no obligation under the Sixth Amendment of the U.S. Constitution to inform defendant of his right to proceed *pro se* when defendant

expressed a desire that his court-appointed attorneys be replaced; nor did the trial court err in failing to question defendant in accordance with G.S. 15A-1242 where there was no indication that defendant desired to represent himself.

**7. Constitutional Law § 32— waiver of public hearing on motion**

Defendant waived his constitutional right to a public hearing on his motion to discharge his court-appointed attorneys, and defendant's constitutional right to a public hearing was not violated by a hearing on the motion in chambers, where the trial judge specifically asked defendant if he wanted the matter heard in closed court or open court; defendant unequivocally responded on three occasions that he preferred to proceed with the court being closed; and defendant stated that he was waiving the provisions of the State and Federal Constitutions which require that courts be open to the public. Sixth Amendment to the U.S. Constitution; Art. I, §§ 18 and 24 of the N.C. Constitution.

**8. Criminal Law § 91.6— denial of continuance—effective assistance of counsel**

In this prosecution of defendant upon three charges of first degree murder, defendant was not denied the effective assistance of counsel by the trial court's denial of his motion for continuance made on the ground that defendant was in Dorothea Dix Hospital in Raleigh for some eight days and was returned to the county of trial only three days before the trial began since defendant waived his absence in Raleigh as a ground for continuance by failing to object to the court's allowance of the State's motion that he be committed to Dorothea Dix for observation, and since that action could not have prejudiced defendant because it was consistent with his notice of the possibility of an insanity defense; nor was defendant denied the effective assistance of counsel by the trial court's refusal to grant him a continuance because the district attorney informed defense counsel shortly before trial that he intended to rely upon a theory of lying in wait as to two of the killings where such notice was not based upon any evidence that had not been furnished through the discovery process, and the trial court did not instruct the jury on the theory of lying in wait.

**9. Homicide § 21.5— first degree murders—sufficiency of evidence**

The State's evidence was sufficient for the jury in a prosecution of defendant for the first degree murders of two deputy sheriffs and a highway patrolman by shooting them with a shotgun or a rifle.

**10. Homicide § 25.1— felony murder—killing of another as underlying felony**

The trial court did not err in charging on theories of felony murder as to the death of a deputy sheriff based on the underlying felony of the prior killing of another deputy and as the death of a highway patrolman based on the underlying felony of the killing of either of the two deputies where there was no break in the chain of events which began with the killing of one deputy and culminated in the killing of the highway patrolman, and the shootings of the second deputy and the highway patrolman tended to exhibit the attribute that they were perpetrated so that defendant could avoid identification and arrest for shooting and killing the first deputy.

State v. Hutchins

11. **Homicide § 26— second degree murder—erroneous instruction on "without malice"—harmless error**

Defendant was not prejudiced by the trial court's erroneous instruction permitting the jury to find defendant guilty of second degree murder if it found the killing was "without malice" where the trial court correctly instructed the jury on the elements of second degree murder at least six times in other portions of the charge.

12. **Homicide § 24.1—intentional killing with deadly weapon—inference of malice—erroneous instruction—harmless error**

The trial court's error in one instance in failing to charge the jury that the inference of malice from evidence of an intentional killing with a deadly weapon was a permissible one and that the jury was not compelled to infer malice from such evidence was not prejudicial to defendant where the trial court on five other occasions correctly instructed the jury on the nature of the inference.

13. **Constitutional Law § 80; Homicide § 31.3— constitutionality of death penalty**

The North Carolina death penalty is not unconstitutional.

14. **Criminal Law § 85.1— character evidence—refusal to permit witnesses to elaborate**

The trial court did not err in sustaining the objections of the district attorney which prevented defendant's character witnesses from elaborating upon their testimony during the sentencing phase of a first degree murder trial where the record indicates that the answers would have been irrelevant or unresponsive in those instances in which objections were sustained, and there could have been no prejudice to defendant because in each instance the witness had already detailed his knowledge of defendant's reputation.

15. **Criminal Law § 117— sentencing hearing—character evidence—erroneous instruction—harmless error**

Defendant was not prejudiced by the trial court's erroneous instruction at the close of the sentencing hearing in a first degree murder case that the State had offered evidence at the guilt phase of the trial which tended to show that defendant had a bad character and reputation when in fact the State offered no character evidence at the guilt phase but only offered such evidence at the sentencing phase.

16. **Criminal Law § 135.4— first degree murder case—sentencing phase—jury instructions**

The trial court's instructions in the sentencing phase of a first degree murder case did not allow or encourage the jury to exercise unbridled discretion but properly defined aggravating and mitigating circumstances and properly laid the foundation for the jury to determine whether defendant's crimes could be appropriately punished by the imposition of capital punishment.

17. **Criminal Law § 135.4— first degree murder case—sentencing phase—form of issues**

The trial court did not err in framing the issues for the jury during the sentencing phase of a first degree murder prosecution where the court submit-

ted a verdict form which set out mitigating and aggravating circumstances as issues one and three, respectively; issue two inquired as to whether any aggravating circumstances which the jury found were sufficiently substantial to call for the imposition of the death penalty; issue four asked the jury if it found unanimously that the mitigating circumstances were insufficient to outweigh the aggravating circumstances; and the form went on to provide that if the jury answered issue four "no" it was to indicate that its punishment recommendation was life imprisonment, and if the jury answered the issue "yes" it was to indicate that its punishment recommendation was death.

18. **Criminal Law § 135.4— first degree murder case—failure to agree on sentence within reasonable time—life imprisonment imposed—refusal to instruct**

The trial court did not err in refusing during the sentencing phase of a first degree murder trial to instruct the jury that its failure to agree unanimously on the sentence within a reasonable time would result in the imposition of a sentence of life imprisonment.

19. **Criminal Law § 135.4— first degree murder—purpose of avoiding arrest—reliance on conduct in both guilt and sentencing phases**

While the State's theory in the guilt phase of a trial of defendant upon three charges of first degree murder was that the second and third murders were committed for the purpose of avoiding or preventing a lawful arrest for the first murder, the State was not barred from relying on that same conduct as an aggravating circumstance in the sentencing phase of the trial.

20. **Criminal Law § 135.4— first degree murder—sentencing phase—aggravating circumstances—resisting arrest—murder against law officer**

The trial court in a first degree murder prosecution did not err in submitting to the jury during the sentencing phase the aggravating circumstances that the murder was committed for the purpose of resisting a lawful arrest and that the murder was committed against a law officer who was engaged in the performance of his lawful duties, since the aggravating circumstance that the murder was for the purpose of avoiding or preventing a lawful arrest required the jury to weigh defendant's motivation in pursuing his course of conduct, and the aggravating circumstance that the murder was committed against an officer engaged in the performance of his lawful duties involved the consideration of the factual circumstances of defendant's crime.

21. **Criminal Law § 135.4— first degree murder case—sentencing phase—mitigating circumstance—no history of prior criminal activity**

The trial court had no duty to instruct the jury during the sentencing phase of a first degree murder case on the mitigating circumstance that defendant did not have a significant history of prior criminal activity where defendant presented evidence tending to show only that he had a good reputation in the community in which he lived but failed to go forward with any evidence that he did not have a significant history of prior criminal activity.

22. **Criminal Law § 135.4— finding of mitigating circumstance—imposition of death penalty**

The trial court did not err in entering judgments imposing the death penalty for two first degree murders because the jury found the mitigating cir-

cumstance that defendant committed the murders while he was under the influence of mental or emotional disturbance where the jury also found that three aggravating circumstances existed beyond a reasonable doubt, that they were sufficiently substantial to call for the imposition of the death penalty, and that the mitigating circumstance was insufficient to outweigh the aggravating circumstances.

**23. Criminal Law § 135.4; Homicide § 31.1— death penalty for first degree murders**

Sentences of death imposed on defendant for the first degree murders of a deputy sheriff and a highway patrolman were not disproportionate or excessive considering both the crime and the defendant where the record clearly established a course of conduct on the part of defendant which amounted to a wanton disregard for the value of human life and for the enforcement of law by duly appointed authorities.

Justice MEYER took no part in the consideration or decision of this case.

Justice EXUM dissenting.

Justice CARLTON dissenting.

APPEAL by defendant from judgments of *Smith (Donald L.)*, *S.J.*, entered at the 17 September 1979 Criminal Session of McDowell Superior Court sentencing defendant to life imprisonment following his conviction of the crime of second-degree murder, and imposing two sentences of death following his conviction of two counts of first-degree murder. This case was docketed and argued as No. 5, Fall Term 1980.

Upon pleas of not guilty, defendant was tried upon bills of indictment proper in form which charged him with three counts of first-degree murder.

At trial, the state presented evidence which tended to show that:

Defendant was married and the father of three children: two daughters, Charlotte and Lisa; and one son, Jaime. The family lived near Rutherfordton, North Carolina. On 31 May 1979, defendant took a day off from his job with a local tree company. His older daughter, Charlotte, was to graduate from high school that evening, and he wanted to help her prepare for the festivities.

On the morning of said date, defendant drove to Chesnee, South Carolina, with Charlotte where he purchased vodka, as well as two six-packs of beer. The liquor was to be used by Charlotte

in making punch which was to be served at a party that several of her classmates were staging that evening following the graduation ceremonies. Charlotte had volunteered to make the party beverage even though she was not planning to attend the gathering herself. As he drove back to Rutherford County with his daughter, defendant began drinking the beer which he purchased. The couple arrived at their home at approximately noon. Shortly thereafter, Charlotte mixed the punch. In doing so, she used the entire fifth of vodka that her father had purchased, as well as several kinds of fruit juices. After she finished her task, Charlotte left the house for several hours and went shopping with her boyfriend, Steve Owens.

When Charlotte returned home at approximately 5:00 p.m., she found her father to be agitated and angry. Defendant had drunk some of the punch while Charlotte was gone. He argued that the punch was too strong for the teenager's friends to drink. Charlotte disagreed and told her father that the punch belonged to her friends because they had paid for it.

The disagreement with his daughter made the defendant more angry than he was already, and he began to insist that Charlotte give him half of the mixture. She refused and poured it out completely. Upon doing so, Charlotte filled the container with water and gave it to her father saying that it was no longer too strong. Defendant continued to press the issue by saying that he was going to return to Chesnee for more liquor so that he could make his own punch. As Charlotte pleaded with defendant not to ruin her graduation, he began beating her about her face and chest with his fists.

During her afternoon shopping trip, Charlotte had purchased several house plants and macrame basket holders. After she returned home, she began decorating her room with her purchases. The argument between defendant and his daughter began when she went into the kitchen trying to find some nails to use in her project. When she entered the kitchen, Charlotte was carrying a hammer. As he was beating upon her, defendant sought to wrestle the hammer away from his daughter. In so doing, defendant began choking Charlotte.

The commotion in the kitchen caused defendant's wife and their two other children to go into the room to investigate the

situation. Upon seeing the scuffle, they joined the affray and pulled the combatants apart. Thus freed from the violent grip of her father, Charlotte fled the house and ran across the highway to the home of Mr. and Mrs. Hicks Lewis where she sought refuge.

As she entered the Lewis home, Charlotte told Mrs. Lewis that her father was drunk and beating upon her, as well as upon other members of the family. Mrs. Lewis directed Charlotte to a bedroom at the rear of the house and told her to hide under the bed. Charlotte did not remain hidden very long. Instead, she got up, obtained a telephone directory and called the Rutherford County Sheriff's Department. As a result of Charlotte's call, and her relating what had happened, Deputy Sheriff Roy Huskey and another deputy were dispatched to the scene.

The first patrol car on the scene was that driven by Deputy Huskey, who drove his vehicle into defendant's driveway and stopped near the front door. A second patrol car arrived almost immediately. It was occupied by Deputy Sheriff Owen Messersmith. The second cruiser parked partially in the driveway and partially on the highway. Upon seeing the officers, defendant announced that he was armed and ordered them to leave. Shortly thereafter, defendant fired four shots. Both officers were fatally wounded. Thereupon, defendant left the house and drove away in his automobile, a white Ford. At the time he left, defendant was armed with a shotgun, as well as a 30.06 rifle.

Between five and seven minutes after the shots were fired, Steve Owens, Charlotte's boyfriend, arrived at the Lewis' residence, having been called by Charlotte and asked to come get her. When he went into the house, Owens attended to Charlotte's injuries by putting ice upon her bruised and swollen face. As Owens did so, Charlotte told him that four shots had been fired, and she asked him to go across the road to investigate. One could not see the Hutchins' residence from the Lewis' home.

Owens drove across the highway and parked in the driveway. He got out of his car and ran to the second cruiser where he found the dead body of Officer Messersmith sprawled beside the car. The young man picked up the microphone in the patrol car, and he transmitted a message to the sheriff's office that an officer had been shot. Owens also informed the authorities that defend-

ant had fled the scene in the family automobile and that he was armed. The young man did not approach the first vehicle. Mrs. Hutchins and the other two children came out of the house unharmed. They, as well as Charlotte, left with Owens who took them to the Rutherford County Jail for their own safety.

Within a few minutes, Deputy Sheriff Junior Boone, who had heard the radio transmission, arrived on the scene. The officer found Deputy Messersmith on the ground and without any pulse. Deputy Messersmith's revolver had not been drawn. The officer also found Deputy Huskey fatally wounded in the head and slumped in the front seat of his cruiser. The windshield of the cruiser was shattered. Huskey's revolver was in the backseat of the patrol car.

Two members of the North Carolina Highway Patrol, Officer Wayne Spears and Officer Gary Sorrells, were on patrol in Rutherford County. Both of them were in cruisers which were equipped with scanners which enabled them to pick up transmissions from the Rutherford County Sheriff's Department. Upon hearing the transmission from Owens, Patrolman Sorrells contacted the Highway Patrol dispatcher in Asheville and conveyed the substance of the call, including a description of defendant's automobile. Patrolman R. L. Peterson did not have a scanner in his cruiser, but he did overhear the conversation between Officer Spears and Sorrells concerning the incident Owens had reported. Shortly before he overheard the conversation, Officer Peterson had met Officer Robert Kiser, another Highway Patrolman at the Rutherford County and McDowell County line on U.S. Highway 221. At approximately 5:50 p.m., Trooper Peterson told Trooper Kiser to remain at that location while he traveled south toward Rutherfordton on the highway. Several minutes after his companion pulled away, Officer Kiser was driving south. As he drove along, Officer Kiser heard Officer Peterson radio that he had seen a car matching Owens' description going behind a lumber company and that he was in pursuit. Officers Sorrells, Spears and Kiser all closed in upon the area after the transmission.

As Trooper Peterson gave chase, he continued to transmit information as to his location. The last transmission that the officer made was that the white Ford had stopped and that its driver was headed for the woods. Within a matter of minutes, Officer

Spears arrived at the scene and found Officer Peterson dead of a head wound. The trooper's body was in the front seat. His gun had been fired and was lying on the floor beneath the steering wheel. There were bullet holes in the windshield, as well as in one of the cruiser's fenders. Defendant's car was found abandoned on a dirt road approximately a half mile away.

Once defendant's vehicle was discovered, additional law enforcement officers, as well as bloodhounds, were brought to the area. At approximately 11:15 p.m., several searchers made the initial contact with defendant. After identifying himself, defendant refused to surrender and threatened to kill anybody who approached his position. After inquiring about the condition of the trooper and deputies, and after saying that he had been beaten by the deputies with blackjacks, defendant admitted killing both of them. When one of the officers stated that he thought the state trooper would be all right, defendant replied that "I know better than that. I blowed his g-- d--- head off." At approximately midnight, defendant broke off contact with the search party.

The officers heard movement around their position throughout the night, but they made no effort to change their location. Defendant spoke with the officers again at approximately 5:15 a.m. on 1 June. After he vocally challenged the searchers, defendant opened fire briefly. Four more bloodhounds joined the manhunt at 7:00 a.m. Not long after the fresh dogs were released, contact with defendant was made again. Defendant responded to the officer's calls by asking that the dogs be called off. Very shortly thereafter, he surrendered to the authorities.

Defendant presented no evidence.

Defendant was found guilty of the second-degree murder of Deputy Huskey and the first-degree murders of Deputy Messersmith and Trooper Peterson.

*Attorney General Rufus L. Edmisten, by Deputy Attorney General Jean A. Benoy, for the State.*

*Wade M. Smith and Roger W. Smith for defendant-appellant.*

BRITT, Justice.

## I

In the early morning hours of 1 June 1979, defendant was arrested in a rural area of Rutherford County and charged with three counts of first-degree murder. Later that same day, defendant was found to be an indigent, and Mr. David K. Fox, a member of the Henderson County Bar, was appointed to represent him. Shortly thereafter, Mr. Ronald G. Blanchard, who was also a member of the Henderson County Bar, began to assist Mr. Fox in the preparation of defendant's case.[1] During the months of June, July and August 1979, the attorneys filed numerous pretrial motions, including motions for a change of venue, suppression of certain evidence, and a psychiatric evaluation of defendant. Following hearings on these motions, the cases were removed to McDowell County for trial, and the motion to suppress was overruled. Psychiatric evaluations of defendant were conducted. At all times prior to trial, defendant was incarcerated in the Buncombe County Jail in Asheville.

On 16 August, defendant made a motion through defense counsel that his court appointed attorneys be discharged "for good and sufficient reasons." A hearing was held, and Superior Court Judge Robert D. Lewis denied the motion.[2]

On 4 September 1979, Mr. Fox received a letter from defendant who was then confined in the Buncombe County Jail in Asheville. Dated 31 August 1979, the letter read as follows:

> I am fire you from my case. I'll not to court with you as my lawyer. You have lie to my (illegible) in other words I don't need you any more at all. That is that. Good-bye.

---

1. At an early state of the proceedings, the Honorable Hollis M. Owens, Jr., then a District Court judge, informed Mr. Fox that an additional attorney could be appointed to assist him in representing defendant. Mr. Fox thereupon requested the appointment of Mr. Blanchard as co-counsel. For reasons which do not appear in the record, an order confirming the appointment was never entered. On 20 September 1979, Judge Smith entered an order appointing Mr. Blanchard, *nunc pro tunc.*

2. The record does not contain a transcript of the proceedings concerning the motion of 16 August 1979. Upon inquiry from the clerk of this court, the McDowell County Clerk of Superior Court advised that there is no transcript of those proceedings in that office.

_State v. Hutchins_

Mr. Fox responded to the letter from defendant by filing a motion in which he asked that the court dismiss him as defendant's attorney of record because "no meaningful communication" was possible between himself and defendant. According to the motion, since the attorney's initial conference with defendant, he had met with a "stiffening personal resistance . . . which soon thereafter involved [sic] into a personal antagonism on the part of defendant" toward the attorney.

A special session of McDowell Superior Court was scheduled for 17 September 1979, and Judge Smith was assigned to preside. Defendant's case was calendared for that session of court. On 5 September 1979, Judge Smith was presiding over a session of Henderson Superior Court. At that time, defendant's attorneys presented the letter to Judge Smith, and he proceeded to conduct an informal hearing in the presence of defendant, defense counsel, the district attorney, and a court reporter.[3]

Throughout the day of 5 September and into the next, the court closely questioned defense counsel about the nature of their relationship to defendant. Defendant was examined by the court in order to determine the nature of the problem between him and his court appointed attorneys. During the early part of the hearing, defendant told the court, "I know Mr. Fox is a good lawyer." Upon further inquiry by the court, the following exchange took place:

MR. HUTCHINS: Well, they promised this and promised that, and none of them have come through. The one that had the hearing down at Columbia promised me they'd call my wife; had me brought to the court. She got on the news what the verdict was. Neither one—seen neither one since; nor heard from neither one.

COURT: Hadn't you rather they be spending time preparing your case for trial, than running back and forth seeing you every day?

---

3. All of the parties agreed for Judge Smith to hear defendant's motion for removal of his court appointed lawyers out of term and outside of McDowell County.

MR. HUTCHINS: Yes sir, I had; but they told me they'd come on down and we'd go through with it. We ain't talked over the case at all.

COURT: Is that true, gentlemen?

MR. FOX: Your Honor, on my behalf, I would indicate to your Honor I have gone through with Mr. Hutchins the fact pattern once or twice, probably no longer than an hour's time each time. I ran across difficulty in the conversations, and I was waiting until the transcript of the matter returned, by that time we had reached such an impasse that --

COURT: So, you were waiting for the court transcript?

MR. FOX: I did speak to him at some length at several different occasions, all in custody, mostly in Asheville, in the county jail, Buncombe County Jail. But we had a preliminary hearing at some length involving the alleged statements made by Mr. Hutchins and other matters. And, as I informed Mr. Hutchins and before we went into a two or three hour single discussion, I did want to get that transcript back. In the meantime, things had degenerated.

MR. HUTCHINS: You said that would be back the 29th day of June. You didn't have it at that time.

MR. FOX: Your Honor, I don't think we had the preliminary hearing until around the 12th of June. I think your Honor can take notice that no one can promise a transcript by the 29th.

COURT: You can't control when the court reporter gets the transcript typed.

MR. HUTCHINS: If I can't trust them now, I can't trust them any more.

COURT: What makes you think ---

MR. HUTCHINS: They could let me know what's going on.

COURT: Well, nothing has been going on, except they're getting ready for trial, and doing research and that kind of thing.

MR. BLANCHARD: That is correct, your Honor.

COURT: Well, what do you expect to be going on. There's nothing going on.

MR. HUTCHINS: Well, they could let me know what the outcome of the hearing was, before it got on the news, and they promised to come over there every week.

COURT: Let me tell you something. It may have gotten on the news before they even knew it.

MR. HUTCHINS: It shouldn't have. They should have been told before it--

COURT: What should happen doesn't always happen.

At a later point in the proceedings, after the court asked defendant who he expected would be ready for trial on 17 September, defendant answered, ". . . just like I said, Mr. Fox there, I know he's a good lawyer here in town, but he ain't come through with nothin' [sic]." Thereupon, the court and defendant had the following exchange:

COURT: What do you expect him to come through with at this point?

MR. HUTCHINS: He should let me know what he's doing. He should let me know what the outcome was. He should, at least discuss the case over.

COURT: Let me tell you something. You're in a mess. I hope you understand what a mess you are in. There is no way these lawyers or any other lawyers can represent you unless you cooperate with them.

MR. HUTCHINS: They haven't talked to me any.

COURT: But, let me tell you; unless you cooperate with them. Now, this is the second time you have tried to discharge your attorneys. From what they have said, and I don't know what the truth of the matter is, but from what they have said, you haven't done anything to cooperate with them, either.

MR. HUTCHINS: I've been in jail. They haven't been up there to see me. Mr. Fox has been up there five minutes twice.

COURT: How often do you think they're supposed to go see you? Every day?

MR. HUTCHINS: No, come and discuss the case and go over it with me.

COURT: It's not at trial yet. I can assure you that they will, many time; many, many times. More times, probably, than they would like to admit.

When the hearing reconvened on 6 September 1979, Mr. Dennis Winner of Asheville was present. Mr. Winner had been approached by several members of the bar concerning the situation between defendant and his appointed attorneys. The inquiry was directed at the possibility that Mr. Winner would be in a position to assume responsibility for defendant's case. Mr. Winner stated that he was willing to enter the case only if Mr. Fox would remain as chief counsel. The attorney also went on to inform the court that there were several obstacles in the path of his entry into the case, including conflicting court calendars and impending religious holidays.

Following the hearing, the court entered an order making findings of fact that defendant had made no showing which would amount to legal justification for removing either or both of his court appointed attorneys; that the only reason defendant had articulated for wishing to have his attorneys discharged was because of his stated belief that they had not visited him enough to discuss the case; and that there had been no showing that defendant's attorneys were failing to prepare themselves for trial. The court then ordered that defendant's motion for removal of his attorneys and appointment of substitute counsel be denied.

It is defendant's contention on appeal[4] that "the attorney-client relationship here at issue was clearly a marriage of convenience (for the State)" and that the trial court committed prejudicial error in requiring that he and his attorneys proceed to trial when none of them wanted to continue the relationship. Our deliberations have led us to conclude that there was no error.

There are two prongs to our analysis: First, the implications of an alleged conflict between an indigent defendant and his

4. It will be noted that defendant has been assigned new counsel on appeal.

court-appointed attorney; and, second, the obligation of a court to inform a defendant of his right to proceed *pro se.*

A.

**[1-4]** A cardinal principle of the criminal law is that the sixth amendment to the United States Constitution requires that in a serious criminal prosecution the accused shall have the right to have the assistance of counsel for his defense. *Argersinger v. Hamlin,* 407 U.S. 25, 32 L.Ed. 2d 530, 92 S.Ct. 2006 (1972); *Gideon v. Wainwright,* 372 U.S. 335, 9 L.Ed. 2d 799, 83 S.Ct. 792 (1963); *see generally* J. Cook, *Constitutional Rights of the Accused: Trial Rights,* § 22 (1974). The competency of a criminal defendant's counsel does not amount to a denial of the constitutional right to counsel unless it is established that the attorney's representation was so ineffective that it renders the trial a farce and a mockery of justice. *State v. Sneed,* 284 N.C. 606, 201 S.E. 2d 867 (1974). In the absence of any substantial reason for the appointment of replacement counsel, an indigent defendant must accept counsel appointed by the court, unless he wishes to present his own defense. *E.g., State v. Robinson,* 290 N.C. 56, 224 S.E. 2d 174 (1976). A disagreement over trial tactics does not, by itself, entitle a defendant to the appointment of new counsel. *State v. Thacker,* 301 N.C. 348, 271 S.E. 2d 252 (1980); *State v. Robinson, supra.* Nor does a defendant have the right to insist that new counsel be appointed merely because he has become dissatisfied with the attorney's services. *State v. Sweezy,* 291 N.C. 366, 230 S.E. 2d 524 (1976); *State v. Robinson, supra.* Similarly, the effectiveness of representation cannot be gauged by the amount of time counsel spends with the accused; such a factor is but one consideration to be weighed in the balance. *E.g., Missouri v. Turley,* 443 F. 2d 1313 (8th Cir.), *cert. denied,* 404 U.S. 965 (1971); *O'Neal v. Smith,* 431 F. 2d 646 (5th Cir. 1970).

The hearing which was conducted by Judge Smith fulfilled the obligation of the court to inquire into defendant's reasons for wanting to discharge his attorneys and to determine whether those reasons were legally sufficient to require the discharge of counsel. At the close of that hearing, the court made findings of fact which are conclusive on appeal if they are supported by any competent evidence. *E.g., Gaston-Lincoln Transit, Inc. v. Maryland Casualty Co.,* 285 N.C. 541, 206 S.E. 2d 155 (1974). Judge

Smith found as facts that defendant had made no showing that would amount to legal justification for removing either or both of his court-appointed counsel; that the only reason defendant had articulated for wishing to have his attorneys discharged was because of his stated belief that they had not visited him enough to discuss the case with him; and that there was nothing to show that defendant's attorneys were failing to prepare themselves for trial. These findings are fully supported by the evidence.

The concerns expressed by defendant relating to the frequency he received visits from his attorneys are untenable. While it is no doubt true that the effective assistance of counsel includes the development and nurturing of an attorney-client relationship, we conclude that repeated visits to a defendant's jail cell at a particular level of frequency are not necessarily incident to that development. An attorney is obligated to consult with his client whenever the need arises. Furthermore, an attorney ought to keep his client informed of the status of his case. These duties are clear and hardly open to question. The issue, however, which is posed by this assignment is not whether these duties exist but whether defense counsel failed to so conduct themselves and thereby denied defendant his sixth amendment right to the effective assistance of counsel.

It is manifest that there are no hard and fast rules that can be employed to determine whether a defendant has been denied the effective assistance of counsel. *State v. Hensley*, 294 N.C. 231, 240 S.E. 2d 332 (1978); *State v. Sneed, supra.* Instead, each case must be examined on an individual basis so that the totality of its circumstances are considered. *Id.* Absent a showing of a sixth amendment violation, the decision of whether appointed counsel shall be replaced is a matter committed to the sound discretion of the trial court. *State v. Sweezy, supra.*

[5]   While the frequency of contact between an attorney and his client is one factor to be weighed in evaluating the effectiveness of counsel, appointed counsel need not make perfunctory visits to the jail in order to render effective assistance. At no place in the record is there any evidence which would tend to show that defense counsel were unable to mount a defense which would be consistent with the concept of effective representation. The record indicates that defense counsel had been diligent in all

respects regarding their preparation for trial. There is no question that they engaged in spirited motions practice and discovery, as well as the research which is necessarily incident to cases of this nature. While it is true that defendant insisted that his attorneys had not visited him often enough, there is no indication that the frequency of contact resulted in defendant being misinformed about the progress of the case. Nor is there any suggestion that the level of contact affected adversely the attorneys' preparation for trial. It must be noted that defendant was incarcerated in a county different from that in which his attorneys lived and practiced. The time which would have been required for frequent commuting between Asheville and Hendersonville could have been better utilized in pre-trial preparation. Because of the potential these challenges have for disrupting the efficient dispensing of justice, appellate courts ought to be reluctant to overturn the action of the trial judge in disposing of the matter. Such deference recognizes the superior viewpoint one who is on the scene has as compared with the reviewer of a cold record. All of these considerations lead us to conclude that Judge Smith did not err in denying defendant's motion.

## B.

[6] A criminal defendant has the right under the sixth amendment to refuse representation by an attorney and to conduct his own defense. *Faretta v. California*, 422 U.S. 806, 45 L.Ed. 2d 562, 95 S.Ct. 2525 (1975); *State v. Thacker, supra; see generally* J. Cook, *Constitutional Rights of the Accused: Trial Rights*, § 37 (1974 Cum. Supp. 1980). Recognition of that right does not, however, resolve the issue posed by defendant before this court: whether a court has the constitutional obligation to inform a criminal defendant of his right to proceed *pro se*. It is the opinion of this court that the sixth amendment imposes no such requirement.

In the six years since *Faretta* became the law of the land, the courts of this state, as well as those of the other states, have had numerous opportunities to construe its meaning and parameters. One of the persistent concerns of these cases has been whether *Faretta* requires that appropriate warnings be made to safeguard the right of self-representation. Without exception, the courts which have passed upon the question have concluded that *Faretta*

does not impose such a requirement. Our own court had the opportunity to address this very issue within a matter of months of the Faretta decision in *State v. Branch*, 288 N.C. 514, 220 S.E. 2d 495, *cert. denied*, 433 U.S. 907 (1977). In that decision, we too indicated that *Faretta* did not carry with its recognition of the right of self-representation a concurrent recognition of the right to be warned of its existence.

In *Branch*, at the time of his arraignment, co-defendant Sullivan made a motion for a continuance, indicating that he was dissatisfied with his retained counsel and that he wished to employ another attorney. The motion was denied, and the case proceeded to trial. On appeal, this court rejected the argument that Sullivan had been denied the right of self-representation because the trial judge had not informed him of that right. Holding that such was not mandated by *Faretta*, Justice Copeland correctly observed that:

> The defendant cites *Faretta v. California*, 422 U.S. 806, 45 L.Ed. 2d 562, 95 S.Ct. 2525 (1975), as authority for his position that the court should have advised defendant of his right to proceed without counsel. This case stands for the proposition that a defendant has the right to proceed without a lawyer and not have counsel forced upon him against his wishes. Such is not the situation here.

*State v. Branch*, 288 N.C. at 548, 220 S.E. 2d at 518.

We find *Branch* to be controlling here and we reaffirm its viability because of the striking similarity between the case *sub judice* and it. In both cases, while there was an expression of some dissatisfaction with counsel by criminal defendants, neither defendant suggested any desire to represent himself. In both cases, while the trial court denied the appropriate motions, neither defendant was forced to accept the assistance of counsel generally. Rather, the trial court in both instances refused to be governed by the expressed dissatisfaction with particular attorneys. Unless an accused makes *some* form of an affirmative statement which would amount to a manifestation of a desire to proceed *pro se*, it cannot be reasonably argued that an accused has been forced to accept representation at trial. It is that concern to which *Faretta* was addressed. *See* United States *ex rel. Maldonado v. Denno*, 348 F. 2d 12 (2d Cir. 1965); *People v. Enciso*,

25 Cal. App. 3d 49, 101 Cal. Rptr. 590 (1972); *Russell v. State*, 383 N.E. 2d 309 (Ind. 1978); *State v. Garcia*, 92 Wash. 2d 647, 600 P. 2d 1010 (1979).

At no place in the record is there any suggestion that defendant manifested any desire to represent himself. At the close of the first day's hearing on the motion to withdraw, upon questioning by the court, defendant indicated that it was his desire that his attorneys be removed.[5] The next day, defendant indicated that it was his desire that new counsel be appointed.[6] Such conduct negates any inference that defendant was voluntarily electing to represent himself. *See Tuckson v. United States*, 364 A. 2d 138 (1976). Statements of a desire not to be represented by court-appointed counsel do not amount to expressions of an intention to represent oneself. *Payne v. State*, 367 A. 2d 1010 (Del. 1976); *Perry v. United States*, 364 A. 2d 617 (D.C. App. 1976); *State v. Garcia*, 92 Wash. 2d at 655, 600 P. 2d at 1015. At most, defendant's statements amounted to an expression of the desire that his court-appointed lawyers be replaced. Given the fundamental nature of the right to counsel, we ought not to indulge in the presumption that it has been waived by anything less than an express indication of such an intention. *See State v. Stokes*, 274 N.C. 409, 163 S.E. 2d 770 (1968); *State v. Covington*, 258 N.C. 501, 128 S.E. 2d 827 (1963). The personal autonomy to which *Faretta* is addressed, *see Faretta v. California*, 422 U.S. at 814-17, 45 L.Ed. 2d at 570-72, 95 S.Ct. 2531-32, is not invaded absent such a declaration.

Nor do we perceive that the procedure approved in *State v. Thacker, supra*, has been violated. G.S. § 15A-1242 (1978) provides that:

A defendant may be permitted at his election to proceed in the trial of his case without the assistance of counsel only

---

5. COURT: Mr. Hutchins, are you asking now that Mr. Fox be discharged, or that both Mr. Fox and Mr. Blanchard (be discharged)?

MR. HUTCHINS: Both of them.

6. COURT: . . . I asked you a very simple question. I said you were not going to select your attorneys. I asked you whether, if the court were inclined to make some change, whether you had rather have Mr. Blanchard or Mr. Fox; or Mr. Fox and Mr. Winner?

MR. HUTCHINS: Mr. Winner and Mr. Fox.

after the trial judge makes thorough inquiry and is satisfied that the defendant:

(1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

(2) Understands and appreciates the consequences of his decision; and

(3) Comprehends the nature of the charges and proceedings and the range of permissible punishments.

In *Thacker*, the trial judge questioned the defendant specifically in accordance with the statute. The answers which defendant gave indicated that he had been advised of the right to counsel; that he was aware of the consequences of his decision to represent himself; and that he understood the nature of the charges against him, the range of permissible punishments, and the trial proceedings which were to follow.

In *Thacker*, the defendant explicitly requested the permission of the court to proceed *pro se.* In the present case, there is no evidence in the record which would tend to show or even to suggest that defendant wished to represent himself. That being the case, the fact that the trial judge in Hendersonville did not make a systematic examination of defendant consistent with the mandate of the statute is irrelevant. Assuming, *arguendo,* however, that there *may* have been a desire on the part of defendant to represent himself which was not expressed to the court, it is our conclusion that the trial judge conducted himself in an exemplary manner to the end that defendant was fully informed in all respects concerning the situation which he faced. There can be no doubt that Judge Smith apprised defendant that he had the right to the effective assistance of counsel and that he was aware of the charges which he then faced, as well as the probable punishments which would attach upon a conviction.

## II.

[7] Shortly after the hearing on the motion to discharge counsel convened, the district attorney moved that the hearing be closed. Thereupon, the following exchange occurred:

COURT: Just a minute. I'm going to go into that. Now, I want to ask this, Mr. Hutchins. Mr. Blanchard told me he had discussed it with you. Do you want these matters heard in open court?

DEFENDANT: Closed court, if you please.

COURT: Or closed court. Which do you prefer?

DEFENDANT: Closed court.

COURT: Now, let the record show that I have been informed, and you all correct me if I'm wrong, that prior hearings in this matter, the orders and/or transcripts have been sealed by Judge Lewis.

MR. LOWE: Yes sir.

COURT: With regard to a closed court, Mr. Hutchins, do you waive all the provisions of both the State and Federal Constitutions that require courts to be open and public?

DEFENDANT: Yes sir.

The proceeding was then removed to the judge's chambers. By his second assignment of error, defendant argues that the trial court erred in granting the motion for closure. We find no merit in this contention.

The sixth amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and·public trial, . . . ." *See generally* J. Cook, *Constitutional Rights of the Accused: Trial Rights,* §§ 100-02 (1974 & Cum. Supp. 1980). Section 18 of Article I of the North Carolina Constitution echoes this mandate by requiring that "[a]ll courts be open." Similarly, Section 24 of the same article of the state constitution provides that "[n]o person shall be convicted of any crime but by unanimous verdict of a jury in open court. . . ." These guarantees are not absolute. *State v. Burney,* 302 N.C. 529, 276 S.E. 2d 693 (1981); *State v. Yoes,* 271 N.C. 616, 157 S.E. 2d 386 (1967); *see generally* Annot., 61 L.Ed. 2d 1018 (1980). While every reasonable presumption will be indulged against a waiver of fundamental constitutional rights by a defendant in a criminal prosecution, *e.g., State v. Stokes, supra,* a defendant may waive the benefit of constitutional guarantees by

express consent, failure to assert it in apt time, or by conduct inconsistent with a purpose to insist upon it. *E.g., State v. Gaiten,* 277 N.C. 236, 176 S.E. 2d 778 (1970).

Defendant argues that the hearing on the motion to discharge counsel "was little more than an effort to intimidate and placate" him so that he would be satisfied with his attorneys. Defendant reasons that "[i]t is hard to imagine that the proceeding would have been the same had it been held in open court." The face of the record belies this argument by it showing that the judge dealt with defendant in a patient and solicitous manner. In so doing, Judge Smith began the inquiry by specifically asking defendant if he wanted the matter heard in closed court or open court. Defendant unequivocally responded on three occasions that he preferred to proceed with the court being closed. In the last instance, defendant was responding to the judge's question concerning whether he was waiving the provisions of the state and federal constitutions which require that courts be open to the public. Defendant will not now be heard to complain that his right to a public trial was violated when he expressly waived the benefit of its provisions.[7]

### III.

[8] On 6 September 1979, after defense counsel received a report which had been prepared by a psychiatrist who had examined defendant in the Buncombe County Jail, counsel informed the trial court of the possibility of an insanity defense. The district attorney thereupon moved to transfer defendant to Dorothea Dix Hospital for examination. On 14 September, defendant was

---

7. In his brief, defendant cites this court to the decision of the United States Supreme Court in *Richmond Newspapers, Inc. v. Virginia*, --- U.S. --- , 65 L.Ed. 2d 973, 100 S.Ct. 2814 (1980). Defendant argues that *Richmond Newspapers* controls the case *sub judice* by pointing to the words of Mr. Chief Justice Burger who observed that "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." --- U.S. at --- , 65 L.Ed. 2d at 992, 100 S.Ct. at 2830. Defendant is attempting to fashion support for a sixth amendment claim from a case which has manifest first amendment underpinnings. Defendant cannot demand a new trial upon the assertion of an alleged violation of the constitutional rights of a third person. *United States v. Payner*, --- U.S. --- , 65 L.Ed. 2d 468, 100 S.Ct. 2439 (1980); *State v. Burney, supra. Richmond Newspapers* does not speak to a defendant's sixth amendment right to a public trial. Instead, it is grounded upon the right of access of the public and the press to criminal trials which is guaranteed by the first amendment.

returned to the McDowell County Jail. Two days later, the psychiatrist went to the jail to talk with defendant and observe his behavior. Defendant refused to talk with the doctor and ordered him out of the cell.

The next day, 17 September, defendant's case was called for trial. Before trial, the district attorney informed defense counsel that he intended to rely upon a theory of premeditation and deliberation as to the killing of Deputy Sheriff Huskey and that he intended to rely upon a theory of lying in wait as to the killing of the other two officers. Following receipt of this notice, defense counsel sought a continuance on the ground that defendant was not in any condition to proceed and that preparation for trial was impossible. The motion was denied. We perceive no error in this action.

A motion for a continuance is addressed to the discretion of the trial court, and its ruling thereon is not subject to review absent an abuse of discretion; however, if the motion is based upon a right which is guaranteed by the federal and state constitutions, the question presented is one of law and not of discretion, and the ruling of the trial court is reviewable on appeal. *E.g., State v. Thomas*, 294 N.C. 105, 240 S.E. 2d 426 (1978). Defendant now argues that the denial of his motion by the trial court denied to him his right to the effective assistance of counsel. The record offers no support for this argument.

First, defendant did not object to the trial court's action in granting the motion of the state that he be committed to Dorothea Dix for observation. That action could not have prejudiced defendant because it was consistent with the possibility that an insanity defense could be mounted. In any event, by failing to object, defendant has waived his absence in Raleigh as ground upon which he may rely. Second, the notice that the state gave defense counsel of its theory of the case could not have adversely affected defendant's position. Defense counsel did not challenge the statement of the district attorney that the notice was not based upon any evidence that had not yet been furnished through the discovery process. Furthermore, the trial court did not instruct the jury on theories of lying in wait. It follows, therefore, that the preparation of defense counsel could not have been prejudiced by the denial of the motion to continue.

## IV.

### A.

[9]  Defendant next contends that the trial court erred in denying his motions to dismiss as to first-degree murder, arguing that the only evidence presented by the state was that of encounters between defendant and each of the three officers and the subsequent death of each officer by a gunshot wound. It is defendant's argument that there is no evidence that any of the deaths were perpetrated upon premeditation and deliberation.

Murder in the first-degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *E.g.*, *State v. Davis*, 289 N.C. 500, 223 S.E. 2d 296, *death sentence vacated*, 429 U.S. 809 (1976); *see generally* W. LaFave & A. Scott, *Handbook on Criminal Law*, § 73 (1972). No fixed length of time is required for the mental processes of premeditation and deliberation constituting first-degree murder. *E.g.*, *State v. Sanders*, 276 N.C. 598, 174 S.E. 2d 487 (1970). Premeditation means thought beforehand for some length of time however short. *E.g.*, *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975); *State v. Johnson*, 278 N.C. 252, 179 S.E. 2d 429 (1971). Deliberation does not require brooding or reflection for any applicable length of time but connotes the execution of an intent to kill in a cool state of blood without legal provocation in furtherance of a fixed design. *State v. Davis, supra; State v. Britt, supra; State v. Johnson, supra.* Premeditation and deliberation are seldom susceptible of direct proof, but they may be inferred from circumstantial evidence. *State v. Reams*, 277 N.C. 391, 178 S.E. 2d 65 (1970), *cert. denied*, 404 U.S. 840 (1971); *State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541 (1970). In passing upon a motion to dismiss pursuant to G.S. § 15A-1227, all of the evidence admitted, whether competent or incompetent, is viewed in the light most favorable to the state, and the state is entitled to every reasonable inference therefrom. *E.g.*, *State v. McNeil*, 280 N.C. 159, 185 S.E. 2d 156 (1971). In considering a motion to dismiss, it is the duty of the court to ascertain if there is substantial evidence of each essential element of the offense charged. *State v. Smith*, 300 N.C. 71, 265 S.E. 2d 164 (1980). Upon application of this standard, it is our conclusion that the evidence for the state was sufficient to enable it to go to the jury on the question of defendant's guilt or innocence of first-degree murder in all three cases.

[10]   We also hold that it was not error for the trial court to have charged the jury on theories of felony murder as to the deaths of Deputy Sheriff Messersmith and Trooper Peterson. A homicide which is committed in the perpetration or attempted perpetration of a felony is murder in the first-degree, irrespective of premeditation and deliberation. *E.g., State v. Hairston*, 280 N.C. 220, 185 S.E. 2d 633 (1972). In such cases, the law presumes premeditation and deliberation and the state is not put to further proof of either. *State v. Woodson*, 287 N.C. 578, 215 S.E. 2d 607 (1975), *death sentence vacated*, 428 U.S. 280 (1976); *State v. Jenerett*, 281 N.C. 81, 187 S.E. 2d 735 (1972). A killing is committed in the perpetration or attempted perpetration of a felony for purposes of the felony murder rule where there is no break in the chain of events leading from the initial felony to the act causing death, so that the homicide is part of a series of incidents which form one continuous transaction. *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). A felony comes within the purview of the felony murder rule if its commission or attempted commission creates a substantial foreseeable risk to human life and actually results in the loss of life. *Id.*

In the case *sub judice*, the trial court charged the jury on theories of felony murder as to the deaths of Deputy Sheriff Messersmith and Trooper Peterson. The underlying felony as to the killing of Messersmith was the killing of Deputy Sheriff Huskey. The underlying felony as to the killing of Peterson was the killing of either Huskey or Messersmith. While our research has failed to reveal any case in which the killing of one individual serves as the underlying felony for the conviction of a defendant for the murder of yet another person, we perceive no inherent bar to such a theory, provided that the other requirements of the felony murder doctrine are met. The evidence does not suggest a break in the chain of events which began with the killing of Deputy Huskey and which culminated in the killing of Trooper Peterson. The shootings of Messersmith and Peterson tended to exhibit the attribute that they were perpetrated so that defendant could avoid identification and arrest for shooting and killing Deputy Huskey.

B.

[11]   Defendant also contends that the trial court erred by instructing the jury that:

> . . . if you were to find from the evidence beyond a reasonable doubt that on or about the 31st day of May last, James Hutchins intentionally and without malice and without justification or excuse shot Roy Huskey with a rifle or shotgun, thereby proximately causing Roy Huskey's death, then it would be your duty to return a verdict of guilty of second degree murder. . . .

Clearly, this instruction was erroneous. Second-degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation. *E.g., State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393 (1971). However, it is fundamental that the charge of the court will be construed contextually, and isolated portions will not be held to constitute prejudicial error when the charge as a whole is free from objection. *E.g., State v. Bailey,* 280 N.C. 264, 185 S.E. 2d 683 (1972). A mere slip of the tongue which is not called to the attention of the court at the time it is made will not be held to constitute prejudicial error when it is apparent from the record that the jury could not have been misled thereby. *E.g., State v. Sanders,* 280 N.C. 81, 185 S.E. 2d 158 (1971). While it is true that the instruction set out above is erroneous, we hold that it could not have been prejudicial because Judge Smith correctly instructed on the law of second-degree murder at least six times in his charge.

[12] Similarly, we reject defendant's contention that he was prejudiced by the following portion of the judge's charge:

> If the State were to prove to you beyond a reasonable doubt or if it was admitted that the defendant intentionally killed R. L. Peterson with a deadly weapon or intentionally inflicted a wound upon R. L. Peterson with a deadly weapon which proximately caused his death, then the law implies, first: The killing was unlawful, and second, that it was done with malice.

Upon a showing that there has been an intentional killing with a deadly weapon, the law permits the jury to infer that the homicide was committed with malice. *State v. Patterson,* 297 N.C. 247, 254 S.E. 2d 604 (1979); *State v. Hankerson,* 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds,* 432 U.S. 233 (1977). It is error for a court to fail to charge the jury that it is not compelled to nor need necessarily infer malice. *State v. Patterson, supra.*

We hold, however, that defendant could not have been prejudiced by Judge Smith's failure to instruct the jury that the inference was a permissible one because on five other occasions he correctly instructed the jury upon the nature of the inference.

### V.

After defendant was found guilty of one count of second-degree murder and two counts of first-degree murder, Judge Smith convened a sentencing hearing before the same jury pursuant to G.S. § 15A-2000, *et seq.*, (1978 & Cum. Supp. 1980). Sentencing on the second-degree murder conviction was delayed pending the outcome of the hearing.

The state attempted to introduce evidence, including statements defendant made to law enforcement officers, concerning a prior shooting in which defendant had been engaged. However, after conducting a voir dire, the trial court ordered that the statements be suppressed. The state thereupon rested. Defendant offered the testimony of several witnesses which tended to show that defendant had a good reputation in the community. The state offered rebuttal witnesses whose testimony was to the contrary.

The following aggravating circumstances were submitted as to both first-degree murder convictions:[8]

1. Was the murder of Owen Messersmith (R.L. Peterson) committed for the purpose of avoiding or preventing a lawful arrest?

2. Was the murder of Owen Messersmith (R.L. Peterson) committed against a Deputy Sheriff (N.C. State Trooper) while engaged in the performance of his official duties?

3. Was the murder of Owen Messersmith (R.L. Peterson) part of a course of conduct in which defendant was engaged and which included the commission by defendant of other crimes of violence against another person or persons?

The jury found each of these aggravating circumstances to exist beyond a reasonable doubt.

---

8. Issue sheets were submitted in each case.

The following mitigating circumstances were submitted as to both first-degree murder convictions:[9]

1.  Was the murder of Owen Messersmith (R.L. Peterson) committed while James Hutchins was under the influence of mental or emotional disturbance?

2.  Was the capacity of James Hutchins to appreciate the criminality of his conduct impaired in the murder of Owen Messersmith (R.L. Peterson)?

3.  Was the capacity of James Hutchins to conform his conduct to the requirements of the law impaired in the murder of Owen Messersmith (R.L. Peterson)?

4.  Was there any *other* circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value?

As to both murders, the jury found only one mitigating circumstance: That the murder was committed while defendant was under the influence of mental or emotional disturbance.

Upon finding, as to both murders, that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty, that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, and upon the unanimous recommendation of the jury, Judge Smith pronounced judgments which called for the imposition of two death sentences. Judge Smith also sentenced defendant to life imprisonment for second-degree murder.

A.

[13]  Defendant initially challenges the sentencing phase of his trial by challenging the constitutionality of the North Carolina death penalty. A similar challenge was rejected by this court in *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510, (1979), *cert. denied*, 448 U.S. 907, *reh. den.*, 448 U.S. 918 (1980); *see generally Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976); *Furman v. Georgia*, 408 U.S. 238, 33 L.Ed. 2d

---

9. Issue sheets were submitted in each case.

346, 92 S.Ct. 2726 (1972). *Barfield* controls this assignment of error, and today we reaffirm its validity.

B.

[14]   Defendant next contends that the trial court erred by sustaining the objections of the district attorney which prevented his character witnesses from elaborating upon their testimony. This contention is without merit.

While it is the general rule that a party calling a character witness can only inquire as to the general reputation of the person about whom the questions are asked, the witenss may, on his own, say in what respect it is good or bad. *See generally* 1 Stansbury's North Carolina Evidence § 114 (Brandis Rev. 1973). At the sentencing phase of trial, defendant offered the testimony of five character witnesses, each of whom testified that they knew the character and reputation of defendant in the community in which he lived and that it was good. Each of the character witnesses proceeded to elaborate upon his answers. On six occasions, the trial court sustained the objections of the district attorney. The record indicates that in those instances where objections were sustained, the answers would have been irrelevant to the inquiry or unresponsive. In any event, there could have been no prejudice because in each instance, the witness had already detailed his knowledge of defendant's reputation.[10]

Defendant next brings forward three challenges to the legal sufficiency of Judge Smith's charge to the jury at the close of the evidence at the sentencing hearing. We find no error in the charge.

[15]   Initially, defendant contends that the trial court erred in instructing the jury that the state offered evidence at the guilt phase of trial which tended to show that defendant had "a bad character and reputation." The record indicates that the state of-

10. The state relies upon *State v. Fletcher,* 279 N.C. 85, 181 S.E. 2d 405 (1971), to argue that an exception to the exclusion of evidence cannot be sustained when the record fails to show what the witness would have testified had he been permitted to answer. As a general rule, that is correct. However, this court has traditionally given close scrutiny to capital cases. *E.g., State v. Silhan,* 302 N.C. 223, 275 S.E. 2d 450 (1981). Therefore, it follows necessarily that the *Fletcher* rule does not foreclose our review.

fered no character evidence at the guilt phase of trial. To have done so would have been improper because defendant had not put his character in issue. *E.g., State v. Fulcher*, 294 N.C. 503, 243 S.E. 2d 338 (1978); *see generally* 1 Stansbury's North Carolina Evidence § 104 (Brandis Rev. 1973).[11] On rebuttal at the sentencing phase of trial, the state offered the testimony of two witnesses who stated that they knew defendant's general character and reputation in the community to be bad. Defendant could not have been prejudiced by the trial judge inadvertently stating that certain evidence was received at a phase of the trial different from that which was actually the case.[12] Furthermore, it is established that the use of the phrase "tends to show" does not amount to an expression of opinion. *E.g., State v. Huggins*, 269 N.C. 752, 153 S.E. 2d 475 (1967).

[16] Second, defendant argues that the trial court erred by instructing "the jury in such a way as to permit it to use its discretion in determining punishment." There was no error.

While it is true that the North Carolina capital sentencing procedure contemplates the exercise of discretion by a jury at the sentencing phase of trial, that discretion is not constitutionally impermissible. Any scheme for the imposition of the death penalty which permits either the judge or the jury to impose that sentence as a matter of unbridled discretion is unconstitutional. *Furman v. Georgia*, 408 U.S. at 253, 33 L.Ed. 2d at 357, 92 S.Ct. at 2734 (Douglas, J., concurring); *State v. Barfield, supra; State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973). On the other hand, any method by which a state chooses to implement capital punishment must allow for the particularized consideration of relevant aspects of the character and record of each convicted defendant before the death penalty may be imposed upon him. *Woodson v. North Carolina, supra; State v. Barfield, supra; State v. Goodman*,

---

11. However, it is not error for a court to receive evidence, relevant for some purpose other than proving character, which incidentially bears upon character. *See State v. Foster*, 185 N.C. 674, 116 S.E. 561 (1923). Arguably, elements of the state's evidence at the guilt phase of trial reflected upon defendant's character. None of this was brought to the jury's attention, however, by Judge Smith recapitulating the evidence.

12. In any event, the state was entitled to rely upon the evidence which it produced at the guilt phase of trial at the sentencing hearing. G.S. § 15A-2000(a)(3) (1978).

298 N.C. 1, 257 S.E. 2d 569 (1979). Through the exercise of guided discretion, juries in North Carolina are required to assess the appropriateness of imposing the death penalty upon a particular defendant for the commission of a particular crime. *State v. Barfield, supra; State v. Goodman, supra.* It is not the exercise of discretion but the exercise of unbridled discretion which is unconstitutional. *Gregg v. Georgia, supra; State v. Barfield, supra.*[13]

We find defendant's argument to be unpersuasive because he has failed to demonstrate in any manner that the conduct of Judge Smith allowed or encouraged the jury to exercise unbridled discretion.

Judge Smith instructed the jury that:

. . . an aggravating circumstance is a fact or group of facts which tend to make a specific murder particularly deserving of the maximum punishment prescribed by law, which of course, is the death penalty.

Correspondingly, he instructed the jury that:

. . . a mitigating circumstance is a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of the extreme punishment than other first degree murders.

There was no error in these instructions. Because the sentence of death is a qualitatively different punishment option, *see Woodson v. North Carolina, supra; Furman v. Georgia,* 408 U.S. at 286-95, 33 L.Ed. 2d at 376-80, 92 S.Ct. at 2750-55 (Brennan, J. concurring), any method by which a state seeks to impose capital punishment must differentiate in some rational manner between those crimes which warrant the application of the ultimate sanction and those which do not. *State v. Barfield, supra.* By delineating various aggravating and mitigating circumstances, the North Carolina procedure equips a jury with the tools it will require if it is to ex-

---

13. It is clear that a scheme for the imposition of capital punishment which permits no exercise of discretion is unconstitutional. *Woodson v. North Carolina, supra.*

ercise the guided discretion which is constitutionally mandated. By the instructions which he gave, Judge Smith was laying the foundation for the jury to go about its task in considering whether defendant's crimes could be appropriately punished by the imposition of capital punishment.

[17] Similarly, we find defendant's remaining challenges to Judge Smith's charge, as well as his challenges to the form upon which the jury was to record its sentencing decisions, to be without merit. As to both the murder of Deputy Messersmith and Trooper Peterson, the court submitted virtually identical verdict forms which set out mitigating and aggravating circumstances as issues one and three, respectively. Issue two inquired as to whether any aggravating circumstances which the jury found were sufficiently substantial to call for the imposition of the death penalty. Issue four asked the jury

> Do you unanimously find that the mitigating cir-
> cumstances are insufficient to outweight the aggravating
> circumstances in the murder of Owen Messersmith (R. L.
> Peterson)?

The form went on to provide that if the jury answered Issue Number Four "No" it was to indicate that its punishment recommendation was life imprisonment; if the jury answered the issue "Yes", it was to indicate that its punishment recommendation was death. Judge Smith so instructed the jury by charging it in the following manner:

> If you answer the issue 4 Yes, you would then further
> deliberate upon your sentence recommendation with regard
> to the case that you so find from the evidence beyond a
> reasonable doubt.

> *  *  *

> . . . however, if having answered Issues 1, 2 and 4 yes, you
> are, after further deliberation, satisfied beyond a reasonable
> doubt that the only just punishment for this defendant is the
> death penalty in a given case, you may unanimously so
> recommend.

There was no error either in the framing of the issues or in the corresponding instructions of the judge. Since we have already

held that the statute is constitutional, *State v. Barfield, supra,* the only basis upon which defendant can challenge this portion of the trial is that it did not comply with the dictates of the statute. The procedure so set out for the jury is precisely that contemplated by G.S. § 15A-2000.

[18]   Lastly, defendant challenges the failure of the trial court to instruct the jury that a sentence of life imprisonment would be imposed in the event that it failed to reach unanimous agreement on the proper sentence. There was no error. We have previously held that such an instruction is improper because not only would it be of no assistance to the jury, it would also permit the jury to escape its responsibility to recommend the sentence to be imposed. *State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979).

## D.

Defendant also brings forward three assignments of error which challenge the particular aggravating and mitigating circumstances which were submitted to the jury. None of these contentions have merit.

[19]   Initially, defendant contends that the trial court erred in submitting as an aggravating circumstance that the murder of Deputy Sheriff Messersmith, as well as that of Trooper Peterson, was committed for the purpose of avoiding or preventing a lawful arrest. In support of his argument, defendant relies upon the decision of this court in *State v. Cherry,* 298 N.C. 86, 257 S.E. 2d 551 (1979). Defendant's reliance is misplaced.

In *Cherry,* we held that when a defendant is found guilty of first-degree murder on a theory of felony murder, the trial court may not submit to the jury at the sentencing phase of trial as an aggravating circumstance that the murder was committed during the commission of the underlying felony. Defendant argues that *Cherry* controls the case *sub judice* to the extent that since the state's theory at the guilt phase was that he was resisting arrest, the state ought to be barred from relying upon that aggravating circumstance at the sentencing phase of trial. *Cherry* is grounded upon the criminal law concept that when the state uses evidence that a killing occurred in the perpetration of another felony so as to establish that the homicide was first-degree murder, the underlying felony becomes part of the murder conviction to the

extent that further prosecution or punishment for it is barred. *State v. Cherry*, 298 N.C. at 113-14, 257 S.E. 2d at 567-68. That defendant was resisting lawful arrest in the course of committing a series of homicides does not, by itself, present the problem of merger to which the opinion in *Cherry* was addressed. While that was the state's theory of the case at the guilt phase of trial, it did not constitute an underlying felony on a felony murder theory.

[20] Second, defendant contends that the trial court erred by submitting two aggravating circumstances which were based upon the same evidence as to both first-degree murder convictions: that the murder was committed for the purpose of resisting a lawful arrest and that the murder was committed against a law enforcement officer who was engaged in the performance of his lawful duties. There was no error.

It is error to charge the jury at the sentencing phase of a capital case on multiple aggravating circumstances which are supported by precisely the same evidence. *State v. Goodman, supra.* In *Goodman*, we held that it was error for the trial court to have submitted as aggravating circumstances that the first-degree murder was committed for the purpose of avoiding or preventing a lawful arrest[14] and that the murder had been committed to disrupt or hinder the exercise of any governmental function or the enforcement of the laws.[15] *Goodman* was based upon the premise that such an action amounted to an unnecessary duplication of the statutorily enumerated aggravating circumstances which would lead to an automatic cumulation of aggravating circumstances. *State v. Goodman*, 298 N.C. at 28-30, 257 S.E. 2d at 586-88. However, there is no error in submitting multiple aggravating circumstances provided that the inquiry prompted by their submission is directed at distinct aspects of the defendant's character or the crime for which he is to be punished. *State v. Oliver & Moore*, 302 N.C. 28, 274 S.E. 2d 183 (1981).

In *Oliver & Moore*, the defendants had been convicted of two counts of first-degree murder on felony murder theories. In the course of robbing a convenience store, the defendants had killed the storekeeper and a customer. At the sentencing hearing at

14. G.S. § 15A-2000(e)(4) (Cum. Supp. 1979).

15. G.S. § 15A-2000(e)(8) (Cum. Supp. 1979).

which the defendants were sentenced to death, several aggravating circumstances were submitted to the jury for its consideration. Among other aggravating circumstances, the trial court submitted, as to both murders, the aggravating circumstances that the murder was committed during the commission of an armed robbery and that the murder was committed for pecuniary gain. While we remanded the case for a new sentencing hearing because of a violation of the *Cherry* rule,[16] we went on to hold that there had been no error in submitting the circumstance that the capital felony had been committed for pecuniary gain. We observed that this circumstance examines the defendant's motive for committing the capital crime rather than his acts, as would be the case if the aggravating circumstance of the underlying felony were to be placed before the jury. The latter circumstance prompts the jury's consideration of the underlying factual basis of the crime as opposed to a defendant's subjective motivation. Such is the case here. Of the two aggravating circumstances challenged by defendant here as purportedly being based upon the same evidence, one of the aggravating circumstances looks to the underlying factual basis of defendant's crime, the other to defendant's subjective motivation for his act. The aggravating circumstance that the murder was committed against an officer engaged in the performance of his lawful duties involved the consideration of the factual circumstances of defendant's crime. The aggravating circumstance that the murder was for the purpose of avoiding or preventing a lawful arrest forced the jury to weigh in the balance defendant's motivation in pursuing his course of conduct. There was no error in submitting both of these aggravating circumstances to the jury.

[21]   The last challenge that defendant makes to the sentencing phase of his trial is that the trial court erred in failing to submit the mitigating circumstance that defendant did not have a significant history of prior criminal activity. It is fundamental that the trial judge must declare and explain the law that arises upon the evidence. *E.g., State v. Williams,* 280 N.C. 132, 184 S.E. 2d 875 (1971). The state does not have the burden of proof that in a given

16. When the defendant is convicted of first-degree murder on a theory of felony murder, the underlying felony is merged into and forms a part of the capital offense and may not be considered again as a circumstance which aggravates that offense. *State v. Cherry, supra.*

capital case no mitigating circumstances exist. *State v. Barfield, supra.* It is the responsibility of the defendant to go forward with evidence that tends to show the existence of a given mitigating circumstance and to prove its existence to the satisfaction of the jury. In the case *sub judice,* while defendant presented evidence which tended to show that he had a good reputation in the community in which he lived, that does not, by itself, tend to show that defendant did not have a significant history of prior criminal activity. Since defendant did not go forward with evidence in this regard, nor was there any evidence introduced by the state on this point, the trial court was not obligated to instruct the jury on this mitigating circumstance on its own motion.

E.

[22]  By his final assignment of error, defendant argues that the trial court erred in entering judgments imposing the death penalty in light of the fact that the jury found a mitigating circumstance. The jury found that each of the murders was committed while defendant was under the influence of mental or emotional disturbance. It did not find that defendant's capacity to appreciate the criminality of his conduct was impaired; that defendant's capacity to conform his conduct to the requirements of the law was impaired; or that there were any other circumstances which the jury deemed to have mitigating value. It is defendant's position that since the jury found the mitigating circumstance that defendant committed the murders while he was under the influence of mental or emotional disturbance, the trial court should have sentenced defendant to life imprisonment rather than death. We disagree. Upon proper instructions, the issues presented to a jury at the sentencing phase of a capital case call for that body to answer questions of fact. The jury found in each murder that three aggravating circumstances existed beyond a reasonable doubt; that they were sufficiently substantial to call for the imposition of the death penalty; and that the mitigating circumstances were insufficient to outweigh the aggravating circumstances. That being the case, the trial court was obligated to enter judgments consistent with the jury's unanimous recommendation that defendant be sentenced to death. The jury weighed the circumstances submitted to it and resolved them adversely to defendant's position. Absent a showing of legal error, the trial court was required by statute to enter appropriate judgments

notwithstanding the jury's finding of one mitigating circumstance. There was no error.

F.

[23]  G.S. § 15A-2000(d) directs this court to review the record in a capital case to determine whether the record supports the jury's finding of any aggravating circumstance, whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. Martin*, No. 36, Spring Term 1981, Filed 2 June 1981); *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025 (1981); *State v. Barfield, supra*. This mandate serves as a check against the capricious or random imposition of the death penalty. *Id*. Our review function in this regard is limited to those instances where both phases of the trial of the defendant in a capital case have been found to be free from prejudicial error. *State v. Goodman*, 298 N.C. at 35, 257 S.E. 2d at 590-91.

We have scrutinized the record in the present case. We have carefully scrutinized the briefs and arguments which have been presented to us on behalf of defendant. After complete deliberation, we conclude that there is sufficient evidence in the record to support the jury's findings concerning the aggravating circumstances which were presented to it. There is nothing in the record which would indicate that the sentences of death were imposed under the influence of passion, prejudice or any other arbitrary factor.

The present case does not present the situation in which a victim was brutally murdered in such a way that the episode could be characterized as being a torture slaying. *Compare State v. Martin, supra; State v. McDowell, supra*. Nor can it be said that defendant inflicted death in an exotic manner and stood silent as his victim was ministered to by competent medical personnel. *Compare State v. Barfield, supra*. However, the record clearly establishes a course of conduct on the part of defendant which amounts to a wanton disregard for the value of human life and for the enforcement of the law by duly appointed authorities. These factors lead us to conclude that the sentence of death is not disproportionate or excessive, considering both the crime and the

defendant. We, therefore, decline to exercise our discretion to set aside the sentences imposed.

No error.

Justice MEYER took no part in the consideration or decision of this case.

Justice EXUM dissenting.

All the evidence presented on the question demonstrates to me that the relationship between defendant and his court-appointed counsel had so deteriorated that counsel was unable to provide defendant the effective assistance which the Sixth Amendment requires. I must, therefore, respectfully dissent from the majority's position on this issue and, for this reason, I cannot join in the majority's conclusion that no error was committed in this proceeding leading to imposition of the death penalty upon the defendant.

In *State v. Thacker*, 301 N.C. 348, 271 S.E. 2d 252 (1980), the principal issue was whether defendant had "the constitutional right to have substitute counsel appointed to represent him." The Court, after a thorough, well researched discussion of the problem in an opinion by Justice Carlton, properly on the record before it viewed the situation as a mere dispute between defendant and counsel over trial tactics because of which *defendant* complained that he had difficulty communicating with his counsel. Significantly, in *Thacker* counsel never alluded to any communication problem. *Thacker*, however, recognized the principle that the appointment of substitute counsel is required when "the nature of the conflict between defendant and counsel is . . . such as would render counsel incompetent or ineffective to represent *that* defendant" or when "the relationship between [defendant and counsel has] deteriorated to such an extent that the presentation of his defense would be prejudiced." 301 N.C. at 352, 353, 271 S.E. 2d at 255. (Emphasis original.) Concluding that there was no such break down in the relationship in *Thacker*, this Court found no error in the denial of defendant's motion for substitute counsel.

The principle that when the lawyer-client relationship has so deteriorated that effective representation is no longer possible

substitute counsel must be appointed was also recognized in *State v. Gray,* 292 N.C. 270, 233 S.E. 2d 905 (1977) and *State v. Sweezy,* 291 N.C. 366, 230 S.E. 2d 524 (1976). The principle was not applied in *Gray,* however, because "[w]hether defendant may have been peeved with his attorney for personal reasons, the court had no reason to doubt that attorney's effectiveness and capability as an advocate or to suspect the relationship between defendant and his counsel to have deteriorated so as to prejudice the presentation of his defense." 292 N.C. at 282, 233 S.E. 2d at 913. Neither was the principle applied in *Sweezy* because "[n]o irreconcilable conflict or breakdown in communication between defendant and his counsel has been demonstrated." 291 N.C. at 373, 230 S.E. 2d at 529.

Thus this Court, while acknowledging that deterioration of the lawyer-client relationship to such an extent that effective representation is no longer possible mandates the appointment of substitute counsel, has in past cases properly refused to apply this principle because the record simply did not call for its application.

If this principle has any vitality, however, and I believe that it does, this case demands its application. If it is not to be applied here, I cannot imagine a case in which it would be.

I agree with the majority that motions for substitute counsel should be allowed only for substantial reasons. Mere disagreement over trial tactics, mere dissatisfaction with counsel's services, or general complaints about the infrequency of counsel's jail visits and other communications are not generally, in themselves, reason enough to substitute counsel. The majority seems to view this case as one involving only defendant's complaints that counsel did not visit him often enough in jail or otherwise sufficiently communicate with him about his case. It decides the issue as if this were the only support in the record for defendant's motion. If it were, I would agree with the majority's conclusion on the issue.

I submit, however, that the record contains far more than is alluded to in the majority's discussion of the issue. A fair reading of the record shows that not only did *defendant* desire to have substitute counsel appointed for reasons which admittedly he could but poorly articulate, but that *defendant's counsel,* begin-

ning on 16 August and repeatedly thereafter, urged the trial court to relieve them. Nowhere does the record indicate that counsel's pleas to be relieved were based on mere unwillingness to handle a difficult and undoubtedly unpopular case. Rather counsel consistently and eloquently advised the trial court that they simply could not effectively represent defendant because he had so lost confidence in them and harbored such animosity against them that communication between counsel and client essential to proper trial preparation was impossible.

The motion for substitute counsel was first made more than one month before trial was to begin. It was obviously not made for dilatory purposes. The motion was supported by statements of both defendant and his court-appointed lawyers. Judge Smith conducted a full inquiry into the matter almost two weeks before trial was to begin. This inquiry revealed as severe a breakdown in communication between counsel and client as can be portrayed on a written record.

On 31 August defendant wrote Mr. Fox, his court-appointed lawyer:

"Mr. Fox,

    I am fire you from my case. I'll not to court with you as my Lawyer. You have lie to my mother in other worlds I don't need you any more at all. that is that. good bye."

At the hearing before Judge Smith Mr. Hutchins complained that his lawyers had "promised this and promised that, and none of them have come through." He said, "We ain't talked over the case at all." "If I can't trust them now," Mr. Hutchins said, "I can't trust them anymore." Mr. Hutchins complained that his lawyers had not let him know what they were doing, had not visited him in jail, and had not kept him informed about the outcome of various pre-trial proceedings.

More compelling, however, were the better articulated urgings of both Mr. Fox and Mr. Blanchard, court-appointed counsel, that they be relieved from the case. Mr. Fox said:

*"Mr. Hutchins and I have reached a state where we have an absolute lack of communication. That he has personal — a feeling personal against me as opposed to all other persons in his*

acquaintance; a lack of trust. He doesn't feel he can place trust of his situation, his case in my hands. As a result, *that has put me in a position where—with the lack of communication am unable to prepare effectively for the defense of this case.*

. . . .

"We have gotten psychiatric consultation with Mr. Hutchins, which has been ongoing. We have arranged for the retention of certain records and documents from other jurisdictions, which may be germane to the case; and otherwise made those preparations leading to a defense of this matter. We are now to a point where it is vitally necessary, in my opinion, that I'm able to communicate intimately with Mr. Hutchins and he with me; especially the latter. *On talking about potential defenses based on mental attitudes, mental status, getting inside Mr. Hutchins' mind, and I'm not able to communicate with him, whatsoever, it makes it, at this point, a physical impossibility, as well as a legal impossibility, in my opinion, to adequately prepare a defense on behalf of Mr. Hutchins, as his attorney, to a charge of first degree murder.* As part and parcel with that, being put in this position, I have found in a case of importance, like this, it's necessary for the defense attorney to be in a relaxed and—attitude where input can flow and ideas can flow out; and I have been put on the mental defensive myself. I find myself in a very hesitant, resistant position at this time also. It's very difficult to approach the case mentally." (Emphasis supplied.)

Mr. Blanchard pleaded with the court as follows:

"Mr. Hutchins, each time I talked with him, is stronger and more opposed to Mr. Fox; for matters he feels that he's not been told enough about what's going on. My dealings with him are colored by the fact that he is— *the animosity is great enough for Mr. Fox. He doesn't feel like he can deal with Mr. Fox. In talking with him for a few moments today, he says he doesn't feel like he can trust me. And the animosity is now getting to the place where I think it will interfere with anything Mr. Hutchins and I could accomplish. It would be an unusual case, in that the feeling of animosity, I think, would be picked up by the jury at the table. I think it would work*

*to Mr. Hutchins' detriment.* I realize he does not have the right to fire and pick and choose; but we are dealing with three counts of first degree murder. In something of this nature, I think that *Mr. Hutchins deserves or at least needs* in his own mind *counsel which he can feel comfortable with; that he can believe* what they're going to say; *that he has respect for* their ability. *It is my feeling Mr. Hutchins has none of those for Mr. Fox nor I.*" (Emphasis supplied.)

Later Mr. Blanchard stated:

"Your Honor, earlier this morning, Mr. Fox and I had breakfast together and discussed the matter. At that time, our feeling was that Mr. Hutchins' disagreement with me was, perhaps, not as great as I now realize it is; and discussed the possibility of me staying in with another lawyer appointed. After talking with Mr. Hutchins this afternoon, I would tend to have a difficult time staying in . . . ."

During the hearing Mr. Dennis Winner, a member of the Asheville Bar, appeared. The court inquired whether Mr. Winner could prepare himself for trial of Mr. Hutchins' case by 17 September, the date upon which it was scheduled. Mr. Winner expressd doubts that he could be ready by then. Whereupon Mr. Lowe, the district attorney, argued at length that he was adamantly opposed to any continuance and to appointing substitute counsel if this would work a continuance in the case. Judge Smith then, after finding that defendant had shown no justification for substituting counsel, that his "only reason for wishing to discharge his attorneys is . . . his . . . belief that they have not visited him enough to discuss the case," and that there was no showing that the attorneys were failing to prepare, denied defendant's motion.

The record does not support these findings. All the evidence demonstrates, as I have noted, that the relationship between defendant and his court-appointed lawyers at the time of the hearing before Judge Smith had deteriorated to such an extent that the presentation of his defense would be prejudiced. Indeed Judge Smith never really addressed the question whether under the circumstances counsel could render effective assistance. We indicated in *Thacker* that a finding on this issue should be made. We said, "when faced with a claim of conflict and a request for ap-

pointment of substitute counsel, the trial court must satisfy itself only that present counsel is able to render competent assistance and that the nature or degree of the conflict is not such as to render that assistance ineffective. The United States Constitution requires no more." 301 N.C. at 353, 271 S.E. 2d at 256. The Constitution does, however, require a record which supports the trial judge's conclusion, if made, that the conflict between defendant and counsel is not such as to render counsel's assistance ineffective. Not only was no such conclusion made here, there is nothing in the record which would have supported it.

The conflict between defendant and his lawyers had not ameliorated when the case came on for trial on 17 September. At that point Mr. Fox renewed "the motion of the defendant *and attorneys for the defendant* in regard to dismissal of counsel." When asked if he had anything to present on the motion, Mr. Fox referred to the evidence which had already been heard and then said, "The only other additional evidence that I would place before Your Honor would be that I have since come to the understanding that Mr. Hutchins expressed the feeling to law enforcement officers that I and Mr. Lowe were in company in opening his mail. He shows a sense of distrust in his attorney." Although the real reason for Mr. Hutchins' distrust of his court-appointed lawyers is somewhat obscure, the fact of it is undisputed.[1]

On the day of trial defendant moved for a continuance of the case on the grounds: (1) The defense had not been able adequately to explore Hutchins' mental condition. (2) Mr. Hutchins, himself, was unstable mentally. Mr. Fox told the court:

> "We have just begun to explore the situation in regard to Mr. Hutchins' mental condition. *He has not cooperated with the psychiatrist which may be in a position to present evidence necessary to save his very life.* With the very brief amount of opportunity that the psychiatrist has had to visit with him and the resistance he has met may or may not be necessary to the defense with the psychiatrist to have a

---

1. I note that according to records in the Administrative Office of the Courts, Mr. Fox from 3 June 1974 to 15 October 1976 was an assistant district attorney employed by Mr. Lowe. In view of Mr. Fox's remarks on the day of trial, it is possible that this fact played some part in Mr. Hutchins' attitude toward Mr. Fox.

greater opportunity than he has heretofore had to consult with and treat Mr. Hutchins.

. . . .

"*Mr. Hutchins' mental condition is of a delicate one.* As a result of this, *as late as yesterday evening, he expressed his desire and intent to do what he had last spoken to us seven days before what he was diametrically opposed to doing. He is swinging so intensely from one to another pole in this matter* that it is difficult, if not impossible, for the attorneys to anticipate where he is going to be on any given time. I think this is a serious matter, due to the great degree of mental flux and change he has put to in the last several days. I indicated not only in his psychiatrist out of Asheville to be able to see him, but also for him to be able to have an opportunity to rest and be in a situation for a few days or weeks, at least, or a calm nature before he can decide in his own mind calmly and passionately what he wants to do with the procedure."

Defendant presented no evidence during the guilt phase of his trial. He himself did not testify during the sentencing phase. At the sentencing hearing, psychiatric testimony indicated that Hutchins was a paranoid psychotic who felt that law enforcement agencies were persecuting him. The psychiatrist testifed that such persons "may function well as a neighbor or parent or a husband, but still have this very bizarre delusional system that eventually usually ends up controlling their lives. They are potential for violence because . . . the persecution feelings that they have is terrific and predictable." During this phase, other than the psychiatrist's testimony, defendant simply offered several witnesses who testified that defendant had a reputation for good character in his community, was a good neighbor, and a good father.

The jury found after the sentencing hearing that the first degree murders of Owen Messersmith and R. L. Peterson were committed while the defendant "was under the influence of mental or emotional disturbance." The jury found, however, that defendant's capacity "to appreciate the criminality of his conduct" was not impaired.

This state of the record precludes me from concluding that there was no prejudice in failing to substitute counsel. Prejudice

in such cases rarely arises from what competent counsel does affirmatively. Prejudice more often occurs because of things left undone which should and would have been done had a proper attorney-client relationship existed. An appellate court looking at a cold record can never say with certainty what these things might have been.

Defendant was apparently a paranoid psychotic who believed even before the tragedy that he was being persecuted by law enforcement agencies. Mr. Fox persistently referred to counsel's inability because of the breakdown in the attorney-client relationship properly to delve into defendant's mental condition prior to trial. It is, therefore, probable on this record that had a better relationship existed between defendant and his counsel, an insanity defense could have been more adequately prepared and successfully presented. Therefore I cannot say the state has demonstrated beyond a reasonable doubt[2] that failure to provide substitute counsel was not prejudicial on the guilt phase of the trial.

Even if I were totally satisfied that with the best possible representation arising from an appropriate attorney-client relationship defendant would, in any event, have been convicted of at least two counts of first degree murder, I could not vote to find no error in the sentencing proceeding resulting in the imposition of the death penalty. At this stage of the trial, as delicate as it is crucial, a defendant is entitled to all the skills of advocacy his counsel can muster. There can be no doubt that because of the gross deterioration in the attorney-client relationship these skills were sorely dampened in this case.

I must, therefore, vote for both a new trial and a new sentencing hearing.

My conclusion is supported by the holdings in *United States v. Williams*, 594 F. 2d 1258 (9th Cir. 1979), and *Brown v. Craven*, 424 F. 2d 1166 (9th Cir. 1970). In both of these cases new trials were ordered by the Ninth Circuit Court of Appeals because of

---

2. G.S. 15A-1443(b) provides: "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless."

the severity of the conflict which had developed before trial between defendant and his court-appointed lawyer. In *Brown* the court noted, 424 F. 2d at 1169-70, that defendant was:

> "[F]orced into a trial with the assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever, communicate . . . .
>
>      . . . .
>
>      "We think, however, that to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever."

So, I believe, it was here.

It may, of course, be argued that this defendant would not have cooperated with any lawyer. The record indicates, however, that he would have cooperated with Mr. Winner had Mr. Winner been appointed. Mr. Winner advised the court that he would not want to accept appointment unless:

> "[T]he defendant wanted me to represent him. And so we had a conference in the Buncombe County Jail this morning for 45 minutes or so, maybe an hour; in which we discussed the case and talked about other things that are irrelevant to this conversation. And finally, at the end of it, I asked the defendant if he wanted me to represent him. Without breaking any confidential relationship, what he—I will not say what he said, but he did not give an answer which I could consider answered that question. And I told him that I was—that I did not want to try this case; but that I was willing to do so. And that I would give my best efforts if I got into it, as I do in every case that I get into. And that I would do that, if he wanted me to do it. And when he could not give me an answer that I thought answered the question, I suggested to him that he think about it until now. That we would both be over here at 2:00; and that he could then give the answer whether he wanted me to defend him or not."

The following colloquy then occurred:

> "COURT: O.K., what's your answer, Mr. Hutchins?
>
> MR. HUTCHINS: Yes, I'll accept him."

We cannot know, of course, whether substitute counsel would have ultimately enjoyed an appropriate attorney-client relationship with Mr. Hutchins. The trial court's duty on the record before us was not dependent on such foreknowledge. The trial court's duty was at least to relieve Mr. Fox and Mr. Blanchard and to make a reasonable effort to secure counsel whose relations with defendant would not preclude counsel's effective assistance. For failure to do this, I believe defendant is entitled to a new trial.

Justice CARLTON dissenting.

I agree with that portion of Justice Exum's dissent which relies on the principles enunciated by this Court in *State v. Thacker*, 301 N.C. 348, 271 S.E. 2d 252 (1980). However, I do not reach the question whether defendant received fair representation at the sentencing hearing. I believe this is unnecessary because defendant was denied his constitutional right to counsel from the time the trial court denied his request for substitute counsel. I think defendant's lawyers did the best they could under the most trying of circumstances.

I prefer that this Court voluntarily apply principles it has already established instead of being ordered to do so by higher authority. The State has presented strong evidence of this defendant's guilt. It is simply incumbent upon the State to give him a fair trial before imposing the appropriate punishment.